Filed 3/28/14  P. v. Gibson CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DAN MARK GIBSON, <br><br> Defendant and Appellant. | H037519 <br> (Monterey County <br> Super. Ct. No. SS082957A) |

After a jury convicted Dan Mark Gibson (appellant) of the murder of his wife, Maria "Cherry" Gibson (Pen. Code, § 187, subd. (a)), the trial court sentenced him to 15 years to life in state prison.  Appellant filed a timely notice of appeal.

On appeal, appellant claims that the trial court committed reversible error by (1) refusing his request to instruct the jury on voluntary manslaughter as a lesser included offense of murder, (2) allowing the prosecution to introduce into evidence inculpatory statements he made to police investigators while he was seriously injured and medicated in a hospital bed, in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), (3) failing to instruct the jury not to consider as evidence prosecutorial questions about his character, (4) allowing him to be tried for first degree murder in the event of any

retrial, and (5) that his due process rights to a fair trial were violated because of the cumulative effect of the trial court's errors. For reasons that follow, we affirm the judgment.

*Facts and Proceedings Below*

At the outset, we note that the fact that appellant killed his wife on October 30, 2008, is not in dispute. Appellant admitted to the police, to medical personnel, and in court that he had so done. Specifically, appellant testified that he thought he "choke[d] her to death." The main controversy in the trial court was whether the killing constituted first or second degree murder.

*The Prosecution's Case*

In the early morning hours of October 31, 2008, Grace Swearingen went outside to retrieve her morning newspaper. Ms. Swearingen saw appellant lying on the ground. When police officers arrived a short time later, they found appellant lying directly in front of the garage attached to 1037 Highland Street, #D. When police entered this residence they found the screen door leading out to the third floor balcony "forced off its frame"; it appeared to have been forced out from the inside. Officers found appellant's wife "lying in the bathtub, covered in a white comforter." Her face was exposed and her eyes were wide open and her pupils were fixed and dilated, which indicated to one of the officers that she was dead.

Appellant was taken by ambulance to the hospital. En route a nurse asked appellant if he was in any pain. Appellant responded by saying " 'I killed my wife.' " At the San Jose Regional Medical Center, appellant told an attending physician that he had "murdered" his wife by strangling her.[1]

---

[1]    San Jose Police Officer Jonathan Gemmet was working as a security officer at the Medical Center when appellant was brought into the emergency room. He testified that appellant was conscious and speaking to the medical staff. As a result of what he heard appellant saying, Officer Gemmet activated his department-issued digital audio recorder

2

The pathologist who conducted the autopsy on Ms. Gibson testified that the cause of death was asphyxia due to strangulation. Ms. Gibson's body showed that she had suffered various external injuries including bruises to her scalp and head, several lacerations and abrasions, a stab wound on the neck that went in no more than an inch, and a series of parallel superficial cuts, which he concluded were eight to 10 attempts to cut into her neck consistent "with a sawing motion back and forth." Internal injuries showed that the cartilage in her neck was cracked "as though something were extremely forcefully being pressed against the front of" Ms. Gibson's neck. Ms. Gibson's ribs were broken "all the way up and down," which he concluded was the result of someone applying "a large amount of force, like almost the full weight of a fairly heavy body standing or kneeling . . . on the body . . . ." The pathologist opined that Ms. Gibson was stabbed and had her ribs crushed post mortem. At the time Ms. Gibson was killed she was five feet, two inches tall and weighed 108 pounds.

When Seaside Police Detectives Anderson and Martin interviewed appellant in the hospital, he told them that on October 30, 2008, he and his wife had driven to San Francisco to get the paperwork they needed to fly to the Philippines the next day.[2] When they returned home, they decided to take a nap before tackling the task of packing for the trip. According to appellant, he woke up in a panic. He and his wife talked about the trip to the Philippines and appellant told her that he would not be able to make the trip in the time he had off from work; his wife said she would go with or without him. Appellant said that his wife told him that she had transferred all the money from their bank account to her family's account in the Philippines.

Appellant explained that he moved closer to his wife. Specifically, he "reached, leaned over like [he] was going to kiss her;" his arm was around her neck. Then, he

---

and started recording what was being said. A recording of appellant's conversation with the medical staff was played for the jury.

[2] Appellant was informed of his *Miranda* rights and said that he understood.

"[s]queezed and squeezed." At one point, his wife told him that he was hurting her and squeezing too tight; he squeezed harder. Appellant said that his wife cried out for help; as she was resisting him she kicked out the screen door leading to the balcony. His wife bit him several times during the time he was strangling her. After choking his wife, he retrieved a knife and stabbed her in her right wrist next to the vein, he tried to stab her in the chest and throat area and "crotch area" so she would bleed out, then there would be no question that she would die. In order to confirm that she was dead, appellant said he placed his wife face down in the bathtub filled with water and checked to see if any bubbles surfaced. However, before placing her in the bathtub he "jammed her, in her sternum" with the knife and tried to . . . "break her neck" while she was in the bathtub area.

When the detectives asked appellant why he was angry with his wife, appellant told them "it was the lack of my security of her coming back. It seemed like she had more going for her in the Philippines." Appellant said he did not want to live without her. According to appellant, they had not argued and his wife did not "lash out" at him or "say something or do something to make" him "upset." Appellant explained, "it was me" and he said, "the problems were me." He said that his wife had professed her fidelity to him "numerous times."

Appellant acknowledged that his wife "did not deserve" to die. He felt rage when he attacked her because he "lost . . . all the money" that they shared. However, he admitted that she had done nothing wrong. Appellant confessed that he thought about "slicing" his wife's throat several days before he actually killed her.

In the hours after he killed his wife, appellant walked back and forth several times from his bedroom to the adjoining third-floor balcony intending to jump off and kill himself. After multiple unsuccessful attempts, by accident, he slipped on some water and fell from the balcony to the cement driveway below.

4

As a result of the fall from the balcony, appellant suffered a broken pelvis, injuries to both his legs and numerous abrasions and bruises.

*The Defense Case*

Dr. Daniel McFarland, an anesthesiologist, testified that given appellant's injuries and the drugs administered to him by medical personnel before and during the time appellant spoke to the detectives, he would have expected that appellant's brain function would have been impaired, in addition to him having "some degree of memory impairment." Dr. McFarland listened to the recording of appellant's police interview. He noted that there were indications that appellant's mental faculties were impaired.

Several of appellant's friends and work colleagues testified that in the time leading up to the homicide, appellant had showed signs of stress from his job and was not his usual friendly self. Some said that appellant was not a violent person. On the contrary, he was friendly and caring.

Appellant testified on his own behalf that he worked as a correctional counselor at Soledad Correctional Training Facility, a state prison. Appellant spoke about a relationship he had with an ex-girlfriend, which he described as both limited in scope and platonic in nature. He and the ex-girlfriend belonged to the same gym, but he would schedule his gym visits to try to avoid seeing her—not always successfully, but eventually he ended his gym visits. However, he had accompanied her to a movie on one occasion, and he had called her on his cellular telephone—telephone calls that his wife was aware of and discussed with him. That was a source of stress, as were work problems and the emotional problems of family members from his prior marriage. One result of all this stress was that he could sleep only one to two hours per day; this was despite the fact that he was overdosing himself on Ambien, a sleep-inducing medication.

In the week of the killing, appellant said that he was depressed and not eating or sleeping properly; he had stopped visiting the gym. He had taken off two weeks from work to deal with his depression and was sitting at home watching television without

5

registering the contents of the programs.  He acknowledged that he and his wife were living beyond their financial means.

On the day he killed his wife, they drove to San Francisco to collect airplane tickets for both of them from the offices of Philippine Airlines.  Their flight was scheduled to leave the next day, Friday, October 31.  They returned to their residence to pack.  Appellant said that throughout the day he told his wife that he did not want to undertake the trip.  She said she would go with or without him, although she was worried that he might contact his ex-girlfriend while she was gone if she did go alone.  The amount of things she was packing suggested to him that she did not plan to return to the United States.

Appellant testified that when he awoke from a brief nap, he saw his wife "sitting on the bed with her laptop, and she was going over some figures from what [he] could see."  When he asked what she was doing, she said she was transferring all of their funds to an account held by her family.  Appellant said, "She pressed . . .  a button and . . . said, [n]ow we have no money in our account."

Consistent with his trial testimony, at the hospital appellant had told the detectives about his general life and work situation before the killing; and explained that because of either sleep apnea or stress, or both, he was not sleeping.  Appellant had told the detectives about the situation that had occurred sometime before he killed his wife concerning him being friendly with a former girlfriend; he described the relationship he had with the former girlfriend after his marriage as platonic, but also mentioned his "infidelity."  Toward the end of the interview, he had stated that his wife "had discovered I was[] with my ex-girlfriend."  In addition, he stated that on three or four occasions he had visited "massage parlors" but his wife did not know about these visits, although he suspected that she might have known.  In any event, possibly "the whole week of her demise" they were arguing or having discussions about the ex-girlfriend.  At the same time, he felt jealous of the possible consequences of her ability to associate with

6

celebrities and wealthy business executives through her job at an exclusive resort. He wondered, "what do I have to offer, when you live paycheck by paycheck and so does she[?]" His wife told him that if he loved her he would accompany her on a trip to her native Philippines.

Appellant had explained to the detectives that he viewed the trip to the Philippines as "her way to get out of the marriage," a marriage he wanted to fix; from his perspective he thought "[his] actions . . . in the past, had warranted" her plan to go to the Philippines. However, he "didn't want to go to the Philippines." Before they took a nap, they were arguing about his lack of commitment to go to the Philippines and, he "realized at this point" that their "relationship was over."

Toward the end of the interview, appellant had told the detectives that his wife had not done anything wrong and that he "definitely" had. He summarized by saying he committed the killing because he "wanted security"; and "didn't want to . . . live without her." In addition, he killed her out of "[j]ealousy" of all the people that she "associate[d] with."

Appellant had told the detectives during the interview that he decided he "had no right to . . . live." He went out onto the balcony to jump off and kill himself. He said that before he could leap off volitionally, which he was having trouble doing, he slipped and fell involuntarily. He predicted he would "probably go on death row . . . or [be] put in prison for life."[3]

Appellant testified that when he asked his wife if she was going to come back from the trip to the Philippines, she said that she would not. As a result, he "felt [he] was out of control" because he "was losing everything that was important to" him. During cross-examination, appellant stated that when he asked his wife why she had transferred their funds, she told him that she was leaving him. The prosecutor handed appellant a

---

[3]     The recording of appellant's interview with Detectives Anderson and Martin was played for the jury.

statement for his and his wife's joint bank account for October 1 through October 31, 2008. Appellant looked at the statement and agreed that it did not show any emptying of the account. Further, appellant admitted that he did not ask his wife to try to reverse the transfer. Appellant acknowledged that on the day he killed his wife, the discussions he was having with her concerning their impending trip were conducted in a "conversational tone."

In rebuttal, a police officer who had collected evidence from the couple's bedroom found a laptop computer "in a small hutch-like desk next to the bed." The computer's lid was closed.

*Discussion*

I.      *Alleged Error in Failing to Instruct on Voluntary Manslaughter*

The jury heard instructions on first and second degree murder but not voluntary manslaughter. On the first day of deliberations, the jury sent a note to the judge in which the jury asked, "Is voluntary manslaughter still an option?" The trial court said that it was not an option. The jury then deliberated for approximately 19 hours, before returning its murder verdict.[4]

The jury returned a verdict form stating that they had found appellant guilty of murder but were "[u]ndecided" whether the murder was willful, premeditated, and

---

[4]      The jury deliberated from late in the afternoon on November 19, 2010, again on November 22, on November 23, November 30, and returned a verdict at 3:30 p.m. on December 1. Appellant calculates the total at approximately 23 hours, but we view the record in a different way; specifically, we calculate lunch breaks as running from noon to 1:30 p.m. unless otherwise noted in the record, whereas appellant calculates them as lasting one hour. However, during the five days that the jury deliberated, the jury posed numerous questions for the court—including six questions indicating the jury was wrestling with the question of whether the crime was first or second degree murder—and requested to hear the recording of appellant's police interview, be provided with photocopies of the definition of first degree murder and second degree murder, have appellant's testimony read back, and the testimony of the anesthesiologist.

8

deliberate. The jurors were polled and confirmed that this was their true verdict. The court recorded the verdict and excused the jury.

Thereafter, the trial court ruled that the jury was deadlocked on the degree of the murder and ordered a retrial on the applicable degree of murder. The court ruled that the element of premeditation could be retried pursuant to *Porter v. Superior Court* (2009) 47 Cal.4th 125. However, before retrial occurred, the parties and the trial court reached what may be termed a settlement, agreeing that appellant would agree to be sentenced for second-degree murder, the prosecutor would move to dismiss what the court called "the premeditation allegation," and the court would take the motion under submission and not rule on it until after appellant's appeal was final. Accordingly, with this agreement in place, the trial court sentenced appellant to a prison term of 15 years to life for second-degree murder.

Appellant contends that the trial court infringed on his right to due process under the Fourteenth Amendment to the United States Constitution and to jury trial under the Sixth Amendment. Further, the court erred under state law, by (1) denying defense counsel's motion to instruct the jury on voluntary manslaughter as a lesser included offense to murder, and (2) refusing to permit the jury to consider returning a verdict of voluntary manslaughter despite a question from the jury during deliberations asking whether it could so do.

Defense counsel moved for a voluntary manslaughter instruction, but the trial court denied the motion. In rejecting the requested instruction, the trial court discussed cases it viewed as instructive, including *People v. Moye* (2009) 47 Cal.4th 537 (*Moye*), *People v. Steele* (2002) 27 Cal.4th 1230, and *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*). The court stated that as far as the objective component of the voluntary manslaughter test is concerned, "[t]he only factors that can be considered, in this Court's estimation, are the factors that the victim caused." The court noted that there were two possible victim-caused passion-inducing factors—the victim purportedly telling

defendant that (1) she did not intend to return from the Philippines and (2) she had emptied the couple's joint bank account, transferring the money to an account belonging to her family over which appellant had no control. The court went on to say, with regard to the first factor—her leaving, "is that reasonably objective—is that the kind of thing that would cause a reasonably objective individual to react with this kind of killing passion? And the answer to that is no." Similarly, with regard to the bank account being emptied the court questioned, "[i]s that conduct sufficient to raise a killing instinct or conduct on the part of a reasonably objective person? And the answer to that is no."

After further discussion, the trial court stated that it did not recall "any testimony by anybody, at any time, that [the victim] even raised her voice. It's just not there. There is no taunting. There were discussions. He—the defendant, in his taped statement, talked about it more than he did in his court testimony. He talked about there being these discussions or concerns that she expressed about the gal at the gym. But even those discussion[s] were—weren't described as loud or angry, just unhappy, I guess. [¶] . . . I just don't see anything in the evidence that would justify giving manslaughter, voluntary manslaughter instructions, so the Court is not going to give it. The request to give it is denied."

As noted, *ante*, very shortly after the jury retired to deliberate, the jury sent a note asking the court, "Is voluntary manslaughter still an option? Are the options: [¶] 1. 1st degree murder[.] [¶] 2. 2nd degree murder[.] [¶] 3. manslaughter[.] [¶] 4. acquittal[.]" Again, defense counsel argued that the court should instruct on voluntary manslaughter, "especially now that the jury is asking about it." The court rejected the argument. Instead, the court convened the jury in the courtroom and instructed the jury that the informal answer to the question was "the options are: first-degree murder, second-degree murder, acquittal, and no decision. Manslaughter is not an option. All right? [¶] And then, more formally, I'm going to give you a further instruction. The possible options are: [¶] One, Count 1, the options there are guilty or not guilty of murder. If you

10

unanimously agree on a verdict, complete the verdict form accordingly. If all twelve jurors cannot agree on a verdict, please inform the bailiff. [¶] Two, if the jury finds the defendant guilty of murder, then the question remains as to whether . . . it is willful, deliberate, and premeditated murder. If you are able to reach a unanimous agreement as to whether such murder is or is not willful, deliberate, and premeditated, complete the special finding on the verdict form. If you cannot reach a unanimous agreement, please inform the bailiff that you cannot reach a decision as to the special finding."

Under California law, a trial court has a "duty to instruct on 'all theories of a lesser included offense which find substantial support in the evidence.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 866-867 (*Rogers*).) By instructing on all crimes for which there is substantial evidence, "the trial court's action will avoid an unwarranted all-or-nothing choice for the jury and will ensure that the verdict is no harsher or more lenient than the evidence merits." (*People v. Wickersham* (1982) 32 Cal.3d 307, 324 (*Wickersham*), disapproved on another ground *People v. Barton* (1995) 12 Cal.4th 186, 201.) "Substantial evidence" is evidence from which a jury composed of reasonable persons could conclude that the defendant committed the lesser offense, but not the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Id.* at p. 177.) In particular, "courts should not evaluate the credibility of witnesses, a task for the jury." (*Id.* at p. 162.) "The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Conversely, the "substantial evidence requirement is not satisfied by ' "*any* evidence . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

11

Although no specific type of provocation is required (*Berry, supra,* 18 Cal.3d at p. 515), the court may resolve the question when the provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy. (*People v. Brooks* (1986) 185 Cal.App.3d 687, 693.)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense of voluntary manslaughter should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

The requested instruction, CALCRIM No. 570, would have provided: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from

12

passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Thus, heat of passion arises if, " 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " (*People v. Barton, supra,* 12 Cal.4th at p. 201.) "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

Recently, in *Beltran*, *supra*, 56 Cal.4th 935, our Supreme Court noted that "[t]o be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection." (*Id*. at p. 949.) In other words, "the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Ibid*.)

"[C]ase law and the relevant jury instructions make clear the extreme intensity of the heat of passion required to reduce a murder to manslaughter. This passion must be a ' " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citation].' [Citation.]" (*Beltran*, *supra*, 56 Cal.4th at p. 950.)

In this case, just before the homicide, appellant's wife had (a) indicated that she had transferred all of the money in the joint account to her family's account, and (b)

13

indicated that she might stay in the Philippines after their trip, rather than return to the United States with appellant. The question in this case is do these two facts together constitute legally sufficient provocation—the kind of provocation that " 'would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from . . . passion rather than from judgment.' " (*Beltran*, *supra*, 56 Cal.4th at p. 948.)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*Moye*, *supra*, 47 Cal.4th at p. 549.)

" ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation] or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*Moye*, *supra*, 47 Cal.4th at pp. 549-550.)

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Moye*, *supra*, at p. 550.) " ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." [Citation.]' [Citation.]" (*Ibid*.)

Appellant contends the "dual provocation" present in this case is legally sufficient to meet the objective component of provocation under a heat of passion theory. Appellant compares his wife's threat to not return from the Philippines with examples of

14

infidelity in the case law.  Citing to *Berry, supra,* 18 Cal.3d 509 and *People v. Borchers* (1959) 50 Cal.2d 321 (*Borchers*), appellant argues that a wife's announcement to her husband that she is leaving him is very much the sort of provocation that would cause a husband to act rashly and without deliberation.

In *Berry*, *supra*, 18 Cal.3d 509, a husband killed his wife in a rage following two weeks during which she taunted her husband with her involvement with another man when she had visited Israel.  She told her husband that her lover was coming to America to claim her, and that she wanted a divorce.  (*Id.* at p. 513.)  The defendant had testified that his wife announced to him that, during a trip to her homeland, she had fallen in love with another man, that she had enjoyed his sexual favors, that he was coming to this country to claim her, and that she wanted a divorce.  (*Ibid*.)  Then, for the next two weeks, his wife alternately taunted defendant with her involvement with the other man and at the same time participated in sexual conduct with defendant.  The defendant choked his wife into unconsciousness once.  On the day of the homicide, the defendant's wife found him at their home after she returned from being out all night.  She said, " 'I suppose you have come here to kill me,' " and she screamed at him.  He tried to stop her screaming.  They struggled and defendant finally strangled her with a telephone cord.  (*Id.* at pp. 513-514.)  The *Berry* court noted that in *Borchers*, *supra*, 50 Cal.2d at page 329, they had declared that "evidence of admissions of infidelity by the defendant's paramour, taunts directed to him and other conduct, 'support[ed] a finding that defendant killed in wild desperation induced by [the woman's] long continued provocatory conduct.' [Citation.]" (*Berry*, *supra*, at p. 515.)  Accordingly, the *Berry* court found that under the circumstances of the case, the trial court erred in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion.  (*Id.* at p. 518.)  Specifically, the Supreme Court agreed with the defendant: "Defendant's testimony chronicles a two-week period of provocatory conduct by his wife Rachel that could arouse a passion of

15

jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Id.* at p. 515.)

In *Borchers,* the defendant fell in love with the victim and within two weeks they were engaged to be married. The victim had financial problems, and the defendant helped solve them, including paying her debts, giving her power of attorney over his assets, and buying a life insurance policy naming her as the beneficiary. The defendant also instructed his attorney to prepare papers to adopt her young illegitimate son. Later, the defendant hired a private investigator who informed him the victim was involved with criminals and willingly had sex with one of them, a pimp. She also gave the pimp defendant's money. On the day of the killing, the defendant and victim went for a drive and she admitted her infidelity. She said she wished she were dead, attempted to jump from the car, took a gun from the glove compartment, repeatedly urged the defendant to shoot her, and taunted him by calling him chicken. (*Borchers, supra,* 50 Cal.2d at pp. 323-327.)

We acknowledge that loss of property may be a contributing factor in heat of passion involving marital infidelity. In *People v. Le* (2007) 158 Cal.App.4th 516, a husband killed his wife's lover after an extended period of infidelity. Additionally, the wife had loaned her lover $10,000. (*Id.* at 519.) The defendant cited both acts as reasons for the killing. (*Id.* at p. 522.) Although the trial court instructed the jury on voluntary manslaughter, the court erroneously instructed the jury that "mere words" are not a defense to battery, and the court permitted the prosecutor to argue that words alone cannot form sufficient provocation. (*Id.* at p. 518.) The jury convicted the defendant of second-degree murder. In reversing the conviction, we found it reasonably probable that the jury would have convicted the defendant of voluntary manslaughter. (*Id.* at p. 529.)[5]

---

[5] Loss of property has been *a factor contributing* to provocation in other contexts, apart from marital infidelity. In *Breverman*, *supra*, 19 Cal.4th 142, a group of attackers, seeking retribution for a prior fight, approached the defendant's residence while the

16

In contrast to *Berry*, *Borchers* and *Le*, here, there was absolutely no evidence that appellant's wife was engaged in any extramarital affair, or that she was leaving him for another man; there were no allegations of recent infidelity, and appellant did not claim such thoughts were in his mind when he killed his wife. Further, there was no evidence that she taunted him or even that they had had a heated argument. To the contrary, appellant testified that his wife had not lashed out at him, and had not said something or done something to make him upset. Rather, it was his own insecurity that caused him to become enraged; he did not want to live without his wife. Further, appellant told the police he was angry with his wife because he was afraid she was going to leave him; he felt he could not survive without the money, but he did not feel that she had fooled him.

In essence, appellant is asking this court to agree that there is legally sufficient provocation when the provocation is the bare act of one spouse saying they are leaving the marriage, and they are taking marital money. Respectfully, without more, this we decline so to do. "Adequate provocation" goes " 'beyond that degree within which ordinary men have the power, and are, therefore, morally as well as legally bound to restrain their passions.' " (See *Beltran, supra,* 56 Cal.4th at p. 947.) The two statements—I'm not coming back from the Philippines and I have transferred all our

defendant was inside. (*Id.* at p. 150.) The attackers began beating the defendant's car with clubs and sticks, setting off the car alarm. The defendant began firing a gun from inside his residence, and the attackers fled. One of the fleeing attackers was shot and killed. The defendant stated that he fired at the attackers because they had damaged his car, and he was trying to stop them. (*Id.* at p. 151.) He also insisted that he thought they were trying to enter his home to kill him. The trial court instructed the jury on voluntary manslaughter on a theory of imperfect self defense, but not on a theory of heat of passion. (*Id.* at p. 152.) The California Supreme Court held that the trial court erred. (*Id.* at p. 164.) In its analysis, the court noted the attackers' trespass on the defendant's property and the attack on his car, as well as the fear and panic the attack instilled in the defendant's mind. (*Id.* at p. 163.) The prosecution asked the court to hold that mere vandalism to an automobile is never sufficient provocation, but the court declined to do so, noting that the facts underlying the provocation went beyond mere destruction of property. (*Id.* at p. 164, fn. 11.)

17

money to another account—comprised the only evidence of provocative conduct attributed to the victim; plainly these statements were insufficient to cause an average person to become so inflamed as to lose reason and judgment. (See *People v. Bufarale* (1961) 193 Cal.App.2d 551, 562 (*Bufarale*) [the evidence did not support theory of heat of passion killing when the alleged provocation consisted of the victim's rejection of defendant's continued attentions and her decision to live with her husband].)[6] Were it otherwise, we would see a greater correlation between the divorce rate and the homicide rate.[7] "Mere unrestrained and unprovoked rage, or a 'heat of passion' to wreak vengeance, of a legally sane although emotionally unstable or nervous person is no defense to homicide." (*People v. Danielly* (1949) 33 Cal.2d 362, 377.)

In sum, in this case, there was no substantial evidence supporting the need for a "heat of passion" voluntary manslaughter instruction.

Finally, even if we were to agree with appellant that the court should have instructed on voluntary manslaughter based on heat of passion, we believe any error in failing to give such an instruction was harmless. Generally, " '[t]he erroneous failure to instruct on a lesser included offense . . . is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818 . . . . Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or

---

[6] The *Bufarele* court held that the defendant's killing of a woman with whom he had been living was not, as a matter of law, upon the heat of passion since the defendant's act was one of vengeance, preceded by neither a quarrel with the victim, nor by adequate provocatory conduct on the part of the victim, who had decided to return to her husband. (*Bufarele*, *supra*, 193 Cal.App.2d at pp. 559-563.)

[7] By this we do not mean that the provocation must be sufficient to cause a reasonable person to kill as the dissent implies. Rather, we mean that if the bare act of one spouse saying they are leaving the marriage, and they are taking marital money is sufficient to cause a reasonable person to act out of passion rather than from reason and judgment we would likely see a greater correlation between the divorce rate (one spouse leaving and taking marital money) and the homicide rate (the other spouse reacting out of passion rather than from reason and judgment *and* then killing the other spouse).

18

errors complained of. [Citations.]' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1267.) However, our Supreme Court has observed that "federal courts have held that a trial court's failure to give a requested instruction . . . on a lesser included offense . . . embodying the defense theory of the case and around which the defendant had built his or her defense[] violated the defendant's due process right to present a complete defense." (*Rogers*, *supra*, 39 Cal.4th at p. 872.) In *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*), the First District Court of Appeal explained that "[w]hen malice is an element of murder and heat of passion or sudden provocation is put in issue, the federal due process clause requires the prosecution to prove its absence beyond a reasonable doubt. (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 . . . .) Thus, in California, when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking. [Citations.]" (*Thomas*, *supra*, 218 Cal.App.4th at p. 643.) Accordingly, the *Thomas* court concluded that "*Mullaney* compels the conclusion that failing to so instruct the jury is an error of federal constitutional dimension. [Citation.]" (*Thomas*, *supra* at p.643.) For that reason, the *Thomas* court held that an appellate court "may affirm the verdict 'if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue.' [Citation.]" (*Thomas, supra,* at p. 646.) Of course, the *Thomas* court addressed the issue of "whether the failure to instruct on provocation or heat of passion as it bears on the culpability for homicide, *where warranted* by the evidence, results in an erroneous jury charge on an element of murder, or some lesser error." (*Thomas*, *supra*, at p. 642, italics added.) Here, we have concluded that the evidence did not warrant such an instruction. Nevertheless, as noted, for purposes of our prejudice analysis we will assume that an instruction was warranted and that *Thomas* was correctly decided.

19

Appellant bases his prejudice analysis on three things—the jury question concerning voluntary manslaughter, "weak" evidence of malice, and the length of the jury deliberations.

Appellant places much reliance on the fact that the jury sent a note asking if voluntary manslaughter was still an option to argue that in this case there is a strong likelihood that if the court had instructed on voluntary manslaughter, the jury would have convicted him of that rather than murder. In context, this request is not as significant as appellant suggests.

First, during opening statements defense counsel told the jury that "in this case you'll learn that this man, this 60-year-old man with no criminal record, did a terrible thing. And you'll hear through the instruction that this will fit the classic definition of voluntary manslaughter, which he should be held accountable for."[8] Thus, the jury was told that it would be considering voluntary manslaughter. The trial court did not decide whether to give the voluntary manslaughter instruction until the end of trial. It is significant that the jury asked whether voluntary manslaughter was *still* an option, rather than simply asking if it *was* an option.

Second, the jury asked about voluntary manslaughter shortly after it began deliberating. After learning that voluntary manslaughter was not an option, the jury deliberated for approximately 17 more hours over four more days. Eventually, the jury reported that it was divided over whether to convict appellant of first-degree murder or second-degree murder. Thus, it appears the jury struggled over whether the murder was deliberate and premeditated, not over whether it could convict appellant of a lesser offense.

As to appellant's claim that the evidence of malice aforethought was very weak, we are not persuaded that it was. Appellant told the police that he thought about stabbing

---

[8] On this court's own motion, we augmented the record with the transcript of counsels' opening statements.

his wife to death several days before he killed her; and during the time he was strangling her, he ignored her pleas for help.  Further, despite the fact that she bit him several times and struggled to the point where she kicked out the screen door appellant continued to strangle her until she was dead.  (See *Shakleford v. Hubbard* (9th Cir. 2000) 234 F.3d 1072, 1078-1079 [where evidence showed that the defendant strangled the victim to death, jury had to have found malice where a pathologist testified it took at least 10 minutes for the victim to die and evidence showed that the defendant listened to the victim's sobs as he strangled her until she died].)  "[H]omicide by strangulation indicates malice . . . ."  (*People v. La Vergne* (1966) 64 Cal.2d 265, 272; *see also People v. Caldwell* (1955) 43 Cal.2d 864, 869.)  Thus, the element of implied malice—a prerequisite to the offense of murder in the second degree—was more than sufficiently established by proof of the vicious and brutal manner of the killing.

Finally, appellant places much reliance on the fact that the jury deliberated for "some 23 hours" to argue that here the jury was faced with a difficult decision and had the court instructed with voluntary manslaughter, the jury, faced with the uncontroverted fact that he killed his wife, would have elected to convict him of that rather than murder as a less undesirable alternative to letting him go free.  We are not persuaded that such is the case.

First, as noted *ante*, the actual time the jury deliberated was closer to 19 hours. Further, during that time, the jury posed numerous questions for the court—including six questions indicating the jury was wrestling with the question of whether the crime was first or second degree murder—and requested to hear the recording of appellant's police interview, be provided with photocopies of the definition of first degree murder and second degree murder, have appellant's testimony read back, and the testimony of the anesthesiologist.  It seems logical that such time should not be included in the time calculated for deliberation because during such time the jury was not actually deliberating the case, but was listening to the testimony that was being read back and the recording of

21

appellant's police interview. Furthermore, as indicated by the aforementioned questions, we must assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties; that is making sure that they understood the difference between first and second degree murder.

Appellant cites our Supreme Court's conclusion that deliberations of almost 12 hours were an indication that a case was not "open and shut." (*People v. Cardenas* (1982) 31 Cal.3d 897, 907.) However, the length of a jury's deliberation is related to the amount of information presented at trial. (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.) Here, the record indicates that there were extensive trial proceedings involving over two dozen witnesses occurring on five different days, over 100 exhibits were admitted into evidence, as well as lengthy closing arguments and several pages of jury instructions. The jury's deliberation of this mass of information over the course of four days speaks only for its diligence; it adds nothing to appellant's prejudice argument.

Given the fact that there was evidence that the source of appellant's anger was his desire to not live without his wife, the strength of the evidence of malice in this case, and the fact that at least some of the jurors thought that there was evidence of premeditation and deliberation, we conclude that any failure to give a voluntary manslaughter instruction was harmless beyond a reasonable doubt. In other words, it appears beyond a reasonable doubt that the assumed error did not contribute to the particular verdict at issue.

II.     *Admitting Defendant's Inculpatory Extrajudicial Statements*

*Background*

On the afternoon of October 31, 2008, after being advised of appellant's admissions about the killing to hospital staff and the San Jose police officer, the interviewing detectives from Seaside went to the hospital. As noted, *ante*, they advised appellant of his *Miranda* rights, he waived them, and he spoke for about an hour and a

22

half. The next day, when law enforcement authorities again sought to question defendant, he invoked his *Miranda* rights and questioning stopped.

Before the detectives began questioning appellant about the killing of his wife, Seaside Police Department Detective Dan Martin and appellant discussed appellant's *Miranda* rights. Specifically, the following colloquy occurred.

"Martin: . . . [B]efore we start talking about [what happened] . . . I'm going to read you some procedural stuff, OK? I'm sure you're aware of what, what has to be read to you under these circumstances. Um, [all right]?

"Gibson: Yes.

"Martin: So, if you don't understand anything I'm telling you, just let me know. [Okay.] You have the right to remain silent. Do you understand that?

"Gibson: Yes.

"Martin: Anything you say can be used against you in the court of law. Do you understand that?

"Gibson: Yes.

"Martin: Uh, you have the right to consult with a lawyer before answering any questions, and to have a lawyer with you during any questioning. Do you understand that?

"Gibson: Yes.

"Martin: Uh, if you cannot afford one, a lawyer, one will be provided to you for free of cost if you want one. Do you understand that?

"Gibson: Yes.

"Martin: [Okay.]"

Before trial, appellant moved to exclude the statements he made from his hospital bed to the detectives. In addition, he sought to exclude his statements to all other medical personnel who treated him.

23

At a pretrial hearing on appellant's motion, Dr. Daniel McFarland testified on appellant's behalf that the combination of his serious injuries and drugs administered to him rendered him incapable of, in the words of defense counsel, "knowingly participating [in] and/or making intelligent decisions."

Dr. McFarland had not treated appellant. Rather, he had reviewed various records that formed the basis for his testimony. He testified that appellant had a closed head injury, a general term meaning that his head had hit something during his fall from the balcony. As a result, he had a diminished level of consciousness when treated initially by first responders.

According to Dr. McFarland, appellant's consciousness level measured at 15 out of 15 possible points under a standard scoring method during his transport to the hospital, which began around 7:10 a.m. on October 31, 2008. However, that did not mean his brain was functioning normally. He should have been able to answer basic questions such as whether he was allergic to drugs, had ever had surgery, was currently using any medications, or was under a doctor's care.

During transport, appellant was administered two powerful drugs, the analgesic Fentanyl and the sedative Versed, but in modest doses. He received four milligrams of morphine sulfate in the emergency room at 8:10 a.m. Nevertheless, about 8:30 a.m. he rated his pain level at 10 out of a possible 10.

According to Dr. McFarland, appellant's condition remained poor throughout the morning. At 11:00 a.m., his blood pressure was 77/49, which indicated serious internal bleeding. At noon it was 78/38.

The two detectives started to interview appellant at 12:25 p.m. At 1:07, while the interview was still in progress, appellant started receiving a blood transfusion aimed at raising his blood pressure.

Dr. McFarland testified that the brain cannot work normally with blood pressure as low as appellant's was at the start of the interview. Appellant would have been in

24

hypovolemic shock. His brain functioning would have been further impaired by his head injury. Finally, the Fentanyl, Versed, and morphine would have prolonged effects because appellant's liver and kidneys could not have metabolized them normally.

Dr. McFarland testified that the next day, i.e., November 1, 2008, before appellant declined to speak to the detectives, he was confused about whether he had left the hospital at some point and could not recall what he had told them the previous day, even though his medical condition was better and he was being helped by morphine. His mental state was still in flux, but when he invoked his rights on November 1, he was lucid.

Finally, Dr. McFarland concluded that as a result of the foregoing—and as medical records, the audio recording of appellant's conversations, and the interview transcripts showed—appellant's "level of consciousness and the clarity of his mentation [were] highly variable from moment to moment." Dr. McFarland went on to say that at times appellant "would appear lucid and cogent . . . . And other times he would respond to a question, particularly ones that involved more than a one[-]word answer, with information that was completely irrelevant." Appellant would have been incapable of making "legally binding decisions, like entering [into] a contract or . . . signing a medical release." In sum, appellant "exhibited . . . the waxing and waning mental status that is typical of patients with his constellation of medical difficulties."

However, Dr. McFarland testified that from listening to the audio recording of appellant's hospital interview, he felt that when appellant was read his *Miranda* rights, he "could not discern anything in the tone of [appellant's] voice or the clarity of his speech that was unusual at that point. What was unusual was that his responses were slow and delayed." Also, Dr. McFarland had not interviewed appellant about his hospital stay, nor had he spoken with anyone who spoke to appellant in the hospital.

The San Jose police officer who was working in the emergency room when appellant arrived testified at the same pretrial hearing on appellant's motion to exclude

25

the evidence of his statements. The officer described hearing appellant tell people that he had murdered and strangled his wife. Appellant's statements were all volunteered; the police officer testified, "I was being very mindful that I did not want to initiate questions, which would also include not encouraging other people to ask him incriminating questions, so I stood by silently with the recorder on."

The flight nurse who attended to appellant during his helicopter ride to San Jose also testified at the exclusion hearing. He felt that appellant was malingering, that is he was feigning a level of neurological disability that he was not experiencing.

With the acquiescence of defense counsel, the trial court accepted the prosecution's offer of proof that if called to testify, the two detectives would state that "during the entire time that they were speaking with [appellant] . . . his answers were appropriate to questions" and "it was clear to them that he was willing to talk," and in fact "in their opinion he was very much willing to talk," but "sometimes he would go off on tangents about the pressures on him and they would refocus him . . . ."

The court found that *Miranda* was waived and that appellant's statements were voluntary. Accordingly, the court denied the motion to exclude appellant's statements he made after he killed his wife. The court reasoned that in contrast to a young, immature, and emotionally stressed suspect, appellant was older and was a prison guard with a greater understanding of the consequences of invoking or waiving his *Miranda* rights. He did not appear confused at the time he waived his rights. His account of events was detailed. The court did not believe that appellant lost consciousness or landed on his head, although his head may have struck the pavement after another part of his body incurred the initial impact with the ground.

Appellant claims that the trial court erred by allowing the prosecution to introduce into evidence his inculpatory statements made in the hospital, evidence that in his view was obtained in violation of *Miranda*, *supra*, 384 U.S. 436. Appellant rests this claim on a factual argument that his physical and mental conditions were too poor for him to be

26

able to knowingly and intelligently waive his constitutional right not to incriminate himself.

The prosecution bears the burden of demonstrating the validity of a defendant's waiver of his *Miranda* rights by a preponderance of the evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 751; see *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [130 S.Ct. 2250].) Additionally, " '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.] On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (*People v. Williams* (2010) 49 Cal.4th 405, 425.)

Pursuant to *Miranda*, *supra*, 384 U.S. 436, a waiver of one's rights to counsel and to remain silent must be " 'made voluntarily, knowingly and intelligently.' " (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) In other words, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals . . . the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Ibid.*)

As noted by Dr. McFarland, appellant's level of lucidity varied during the interview. While being evacuated to the hospital he gave the flight nurse a delusional account—though possibly a feigned one—that the police precipitated his fall from the balcony by spraying a slippery substance on it. At the same time, Detective Martin went through each of appellant's *Miranda* rights in a careful and measured way; and the transcript shows appellant considered each right and waived it in a linguistically appropriate manner. The most Dr. McFarland could say about the colloquy was that appellant's responses sounded slow and delayed on the audio recording of the interview.

27

The essence of appellant's claim is not that his statements were made involuntarily, but that he lacked the capacity to agree to make them.  This parsing of a claim comports with the analysis set forth by other courts.  "The inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions."  (*U.S. v. Cristobal* (4th Cir. 2002) 293 F.3d 134, 139 (*Cristobal*).)  "[A] waiver may very well have been voluntary (that is, uncoerced) and yet given without a knowing and intelligent waiver of *Miranda* rights . . . ."  (*Id*. at p.142.)  Thus "it is not enough for us to find that [a suspect] voluntarily waived his rights.  We must also determine whether the waiver was knowing and intelligent.  Unlike the issue of voluntariness, police overreaching (coercion) is not a prerequisite for finding that a waiver was not knowing and intelligently made."  (*Ibid*.)

In other words, "[w]hether a waiver of *Miranda* rights is voluntary and whether an otherwise voluntary waiver is knowing and intelligent are separate questions.  [Citations.]  While the voluntariness prong is determined solely by examining police conduct, a statement made pursuant to police questioning may be suppressed in the absence of police coercion if the defendant was incapable of knowingly and intelligently waiving his constitutional rights.  [Citation.]  Whether a suspect has knowingly and intelligently waived his *Miranda* rights depends in each case on the totality of the circumstances, including the defendant's intelligence and capacity to understand the warnings given."  (*People v. Howard* (Mich. Ct. App. 1997) 226 Mich.App. 528, 538.)

In *People v. Panah* (2005) 35 Cal.4th 395 (*Panah*), the defendant murdered an eight-year-old girl.  (*Id*. at p. 408.)  Similar to appellant, Panah was horrified by his acts—"I have done something very bad" (*id*. at p. 412), he told another person—and, again similar to appellant, he tried to kill himself.  (*Ibid.*)  When police apprehended the defendant, they found him with slashed wrists, intoxicated, and uttering nonsensical statements.  He told them the victim could be at a motel, at a mall, or at a park, and that

28

he " 'liked her very much, even carry her skeletal remains around.' " (*Id.* at p. 413.)[9] "At times [Panah] spoke clearly, at other times he was incoherent as if he were falling asleep. He appeared to [a police officer] to be under the influence of 'something,' and because of the cuts to his wrists, the paramedics were called. [Panah] was transported to West Valley Hospital for medical treatment." (*Id.* at pp. 413-414.) At the emergency room, an attending physician found, and would later testify, that he "thought [Panah] was 'psychotic,' and described him as being 'agitated' and 'delusional.' He was having auditory hallucinations, acting inappropriately, and had slashes on his wrists that appeared to have been self-inflicted. . . . [Panah] said that people in black hoods had told him to slash his wrists." (*Id.* at p. 416.) The doctor "concluded that [Panah] was 'acutely psychotic,' suicidal and hearing 'command hallucinations, meaning the black robed and hooded figures were telling him to kill himself.' [Panah] was also under the influence of drugs. [The doctor] could not tell whether his psychosis was brought on by the drugs, or was long-standing and relatively quiescent but had been exacerbated. He also acknowledged [that] 'environmental factors,' like 'acute stress' or 'acute grief,' can produce an acute psychotic break." (*Ibid.*)

At the hospital, a detective interviewed Panah after advising him of his *Miranda* rights, which he waived. (*Panah*, *supra*, 35 Cal.4th at p. 470.) The Supreme Court rejected Panah's "claim that his hospital waiver was involuntary because of his compromised physical and psychological condition." (*Id.* at p. 471.) The Supreme Court explained that Panah argued "that when he was admitted to the hospital, he was suffering from acute psychosis, was under the influence of drugs, and was suffering from the effects of his suicide attempt, thus precluding a voluntary waiver of his rights. He also claims he was heavily affected by intrusive medical procedures, including the use of a catheter to extract a urine sample, injection with a tranquilizer, and the injection of

---

[9] The victim had been missing for only a day. (*Panah*, *supra*, 35 Cal.4th at pp. 410-412.)

29

charcoal into his system to absorb the sleeping pills. [Panah] also points out that [the officer] testified that [he] was alternately rational and irrational." (*Id*. at p. 472.)[10]

The *Panah* court noted that the officer who interviewed Panah acknowledged that he was "sometimes irrational during the interrogation, he also testified that [Panah] was responsive to his questioning, and his testimony was corroborated by the nurse who attended [Panah]." (*Panah*, *supra*, at p. 472.) The *Panah* court noted that the trial court had observed "that there was no question of police coercion in obtaining [Panah]'s statement." Accordingly, the *Panah* court concluded that Panah's statements to the detective "were not involuntary." (*Ibid*.)

Although the *Panah* court referred to Panah's claim as one of an "involuntary" waiver (*Panah*, *supra*, at p. 471), it is quite apparent from the circumstances that Panah was advancing the same claim as appellant is advancing here. Voluntariness was not at issue; Panah was obliging, just as appellant was here. The officer in *Panah* "asked [Panah] where the little girl was. [Panah] replied she 'could be at Topanga Canyon and Parenthia' at a motel. He also said she could be at the Fallbrook Mall or at a park located at Topanga Canyon and Roscoe Boulevard. He told the officer he 'liked her very much, even carry her skeleton remains around.' The statement did not make sense to [the officer]. At times [Panah] spoke clearly, at other times he was incoherent as if he were falling asleep." (*Id*. at p. 413.) Although *Panah* spoke of voluntariness (*id*. at pp. 471, 472), in fact the court was addressing capacity to waive *Miranda* rights (*ibid*); it is authoritative for purposes of our analysis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Simply put, *Panah*, *supra*, 35 Cal.4th 395, weighs against appellant's claim. Its facts are remarkably similar to those of this case—we might add only that appellant's

---

[10] The Supreme Court noted that the procedures to which Panah referred took place after the officer interrogated him and could not have had any effect on the voluntariness of his waiver. (*Panah*, *supra*, at p. 472.)

ability to waive his *Miranda* rights was heightened by his law enforcement background. (See *People v. Breaux* (1991) 1 Cal.4th 281, 301 [defendant was well versed in the *Miranda* rights]; *U.S. v. Dire* (4th Cir. 2012) 680 F.3d 446, 474 [the determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system].)[11]

In addition, *Cristobal*, *supra*, 293 F.3d 134 is instructive. The defendant in *Cristobal* "began experiencing personal problems that he claims were the result of his wife's philandering. [After] the couple . . . separated . . . Cristobal blamed his wife for the breakdown in the marriage." (*Id*. at p. 137.) Cristobal alleged that his stress over his wife's affairs " 'mutated into delusional psychosis.' " (*Ibid*.) Cristobal planted three bombs and became the subject of a manhunt. Federal agents shot Cristobal several times, leaving him seriously injured. He underwent surgery and was interviewed in the surgical care trauma unit of a hospital the next day. An agent asked a nurse "whether Cristobal was mentally and physically capable of being interviewed. [The nurse] informed [the agent] that Cristobal was oriented at that time, and [he] began his interview with Cristobal." (*Id*. at p. 138.) The nurse expressed this view even though, in addition to Cristobal's serious injuries, he "had been given pain killers and narcotics such as morphine." (*Id*. at p. 141.)

In rejecting Cristobal's claim that his post-waiver statements should be suppressed under *Moran v. Burbine*, *supra*, 475 U.S. 412, as neither knowing nor intelligent (*Cristobal*, *supra*, 293 F.3d at p. 142), the *Cristobal* court noted that "[a]fter his waiver, Cristobal never asked for the questioning to stop. He never indicated a desire not to

---

[11] Similar to this case, Panah made statements to hospital staff, a circumstance that the trial court addressed in that case: "The trial court also found admissible statements made by defendant to the treating physician and nurse at the hospital, concluding they were not acting as agents for the police." (*Panah*, *supra*, 35 Cal.4th at p. 471.)

confess. No agent harmed or threatened to harm Cristobal if he did not answer their questions. He was not purposely held incommunicado or in seclusion, and he was not subjected to continuous and unrelenting questioning. [Citation.] Unlike the suspect in *Mincey* [*v. Arizona* (1978) 437 U.S. 385], Cristobal's answers to questions were lucid and in fact very detailed." (*Cristobal*, *supra*, at p. 143.) "Though it was obvious to the officers that Cristobal was in pain, he did not slur his words during the interview, he never lapsed into unconsciousness, nodded off or went to sleep. When asked, on more than one occasion, how he was feeling and whether he wanted to continue, he responded that he wished to continue the interview. During the interview, Cristobal appeared to the agents to be contrite and anxious to respond to questions to explain what had happened and why." (*Ibid*.) For all these reasons, the *Cristobal* court found that the defendant's confession was voluntary. (*Ibid*.)

The *Cristobal* court distinguished *Mincey v. Arizona*, *supra*, 437 U.S. 385 by saying, "In *Mincey*, the 'barely conscious' suspect, 'depressed almost to the point of coma,' *expressed his wish not to be interrogated without a lawyer on numerous occasions*. [Citation.] Many of Mincey's answers were unresponsive, and he complained to the officer interrogating him that he was confused and unable to think. [Citation.] Despite Mincey's 'entreaties to be let alone,' the officer only ceased the interrogation during intervals when Mincey lost consciousness. [Citation.] The Court found that Mincey's statements were 'not the product of his free and rational choice,' and that his will was 'simply overborne.' " (*Cristobal, supra,* at p. 143.)

The *Cristobal* court rejected what it perceived to be a possible argument that the agents should have waited "until Cristobal was released from the hospital or transferred out of intensive care before subjecting him to questioning." (*Cristobal*, *supra*, at p.141, fn. 9.) The *Cristobal* court went on to note that "[i]f police conduct could be deemed coercive simply because an interrogation occurs while a suspect is in the hospital, law enforcement officers would be faced with a serious dilemma—wait until suspects are

released (and thus risk losing valuable crime-solving or further crime-preventing information), or risk suppression of statements necessary for conviction." (*Ibid.*) With respect to hospital confessions, *Cristobal* recognized that "there are many scenarios that could render a hospital confession involuntary. Because, in many instances, hospital patients are weakened physically and perhaps mentally, law enforcement officials must be cautious not to exploit suspects' conditions with coercive tactics. In this case, [the agent] certainly acted with caution, and as such, the circumstances here do not warrant a finding of involuntariness. The mere fact that [he] did not wait to interview Cristobal does not amount to police overreaching." (*Ibid.*)[12]

As noted *ante*, it was the prosecution's burden to establish the validity of appellant's *Miranda* waiver by a preponderance of the evidence, and whether it met that burden is a determination we make on appeal after examining the totality of the circumstances. (*People v. Williams*, *supra*, 49 Cal.4th at p. 425.) On the record before this court, we find that the prosecution carried that burden. Appellant's waiver language was unequivocal: he kept answering "yes" to the question "do you understand that?" His account to detectives was detailed and precise and it comported with his trial testimony in many respects. During the questioning, a hospital staff member commented, "he seems very awake, very alert." Against this, appellant did say at one point he was "getting everything mixed up," but at least he recognized what he was doing. However, Dr. McFarland stated that although "his level of consciousness and the clarity of his mentation was highly variable from moment to moment," at the time appellant was read his *Miranda* rights he "could not discern anything in the tone of his voice or the clarity of his speech that was unusual at that point. What was unusual was that his responses were

---

[12] Undoubtedly, there are aspects of *Cristobal* that are at variance with the circumstances of this case. Cristobal's "speech was not slurred, he never nodded off or slept, nor did he indicate in any way that he was under a narcotic stupor." (*Id*. at p. 138.) He was "alert and coherent at the time of the interview." (*Id*. at p. 142.)

33

slow and delayed."  As noted, Dr. McFarland had not interviewed appellant about his hospital stay or talked to anyone who had spoken with appellant in the hospital.

In sum, we conclude that the trial court did not err in allowing the prosecution to present evidence of appellant's inculpatory extrajudicial statements.  (See also *People v. Breaux*, *supra*, at pp. 299-301 [defendant shot twice and morphine administered at the hospital; defendant's condition not life-threatening and his pain level moderate; despite his impaired mental and physical condition, he waived his *Miranda* rights knowingly and voluntarily before police questioning at the hospital]; *People v. Jackson* (1989) 49 Cal.3d 1170, 1189.)[13]

### III.    *Alleged Instructional Error*

Appellant claims that the trial court should have instructed the jury with CALCRIM No. 351, which provides, "The attorney for the People was allowed to ask defendant's character witness[es] if (he/she/they) had heard that the defendant had engaged in certain conduct.  These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct.  You may consider these questions and answers only to evaluate the meaning and importance of (the/a) character witness's testimony."

---

[13]    In *U.S. v. Gaddy* (8th Cir. 2008) 532 F.3d 783 (*Gaddy*), the suspect "had not slept the night before and . . . had consumed alcohol and drugs several hours before he waived his rights" (*id*. at p. 788); in addition, he claimed disorientation because the authorities charged in on him.  (*Ibid*.)  The court stated that " '[i]ntoxication and fatigue do not automatically render a confession involuntary.' [Citation.]  Instead, 'the test is whether these mental impairments caused the defendant's will to be overborne.' " (*Ibid*.)  The court noted that an agent "testified that Gaddy understood his *Miranda* rights, agreed to waive them and appeared 'cooperative' and 'calm' " (*ibid*.) and that "later, [the agent] again asked Gaddy if he wanted to speak with him, and Gaddy said that he did." (*Ibid*.)  "In addition, Gaddy had extensive contact with law enforcement on prior occasions." (*Id*. at p. 789.)  The *Gaddy* court held that the suspect's decision to speak was voluntary.  (*Ibid*.)  Similar to *Panah*, *Gaddy* used the concepts of voluntariness and capacity to waive *Miranda* rights interchangeably.  Nevertheless, the case is informative.

As noted, appellant presented numerous witnesses who testified to his good character and non-violent nature. While cross examining these witnesses, the prosecutor asked whether their opinion would change if the witness knew that appellant had previously grabbed his wife and bruised her arm. Later, outside the presence of the jury, in response to defense counsel's objections, the court ruled that the prosecution could ask the question if she had "a good faith belief that the conduct, which is the subject of the question, occurred."

At the conclusion of the defense case, the court and counsel discussed the matter again. Defense counsel requested an admonition to the jury that the questions asked of both appellant and others were not evidence. The court asked whether defense counsel wanted the court "to highlight" the particular questions or "do that generally." Defense counsel requested that "it just be generally." The court noted that it had already done that,[14] but would do it again at the conclusion of the case. The court asked "[w]ould that be sufficient?" Defense counsel responded in the affirmative.

Just before closing argument, the court again instructed the jury as follows: "At this time, ladies and gentlemen, the attorneys are given an opportunity to argue the case. I'll remind you once again what the attorneys have to say is not evidence. *Their questions aren't evidence*; what they say [sic] during their opening statements to you were [sic] not evidence; and now, in the case of closing argument, their statements, again, are not evidence" (Italics added.)

After the conclusion of closing argument, again the trial court instructed the jury that "Nothing that the attorneys say is evidence. In their opening statements and closing

---

[14]     The court pre-instructed the jury that "Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence. Their questions during the trial are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggests it's true."

arguments, the attorneys discuss the case, but their remarks are not evidence. *Their questions are not evidence*. (Italics added.)

Appellant recognizes that without a request, pursuant to *People v. Daniels* (1991) 52 Cal.3d 815, 882-884, the trial court is not required to sua sponte instruct the jury on the limited use of evidence used to impeach a defendant's good character. He contends, however, that the request for an instruction made by defense counsel should have been understood as a request for CALCRIM No. 351. As outlined, *ante*, the record does not support such an assertion. Without doubt, defense counsel wanted only "that it just be generally . . . ."

Alternatively, appellant argues that if this court is inclined to find that the court was not obligated to give CALCRIM No. 351 in the absence of a specific request, his trial counsel provided ineffective assistance of counsel by failing to state his request in that form.

The test for ineffective assistance of counsel stems from decisions of both the United States and California Supreme Courts. We consider " 'whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189, citing *Strickland v. Washington* (1984) 466 U .S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) A reviewing court will presume that counsel was competent and that his or her conduct was the basis of sound tactical decisions. (*Ibid.*) Accordingly, the burden is on the defendant to demonstrate that his or her attorney was inadequate under the constitutional standard. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.)

Appellant's first hurdle is less a substantive one than a principle of appellate practice. "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be

rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter, supra,* 36 Cal.4th at p. 1189.) Otherwise, the claim may be raised only by a petition for writ of habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Actions taken or not taken by counsel at a trial are "typically motivated by considerations not reflected in the record. It is for this reason that writ review of claims of ineffective assistance of counsel is the preferred review procedure. Evidence of the reasons for counsel's tactics, and evidence of the standard of legal practice in the community as to a specific tactic, can be presented by declarations or other evidence filed with the writ petition." (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243; see also *People v. Mendoza Tello, supra,* at pp. 266-267.) An ineffective assistance claim may be reviewed on direct appeal only where "there simply could be no satisfactory explanation" for trial counsel's action or inaction. (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.)

Appellant argues that there is "lack of any conceivable tactical reason why counsel would have chosen to forego a jury instruction on a point which he clearly felt strongly about." Respectfully, we disagree. Appellant has failed to overcome the presumption that, under the circumstances, the challenged omission could be considered sound trial strategy. (*People v. Duncan* (1991) 53 Cal.3d 955, 966.) The instruction that appellant argues should have been requested would have added very little to the instruction that the court gave three times in this case. Defense counsel could have reasonably concluded that the court's instruction—given three times—that the attorneys' questions during trial were not evidence was adequately conveyed to the jury. Accordingly, appellant has not surmounted the first hurdle in his ineffective assistance of counsel claim.

IV.     *Appellant's Issue Regarding Retrial*

We note that because we affirm the judgment, it is not necessary to address appellant's claim that in the event of a retrial he can only be tried for second degree murder.

We do note in passing that the procedure employed here in recording the verdict was erroneous. "[T]he trial court commits error if it receives and records a verdict of guilty on the lesser included offense without ever having given the jury an acquittal-first instruction." (*People v. Fields* (1996) 13 Cal.4th 289, 310.) "[W]hen the jury returns a verdict on the lesser included offense, it must also render a corresponding verdict of acquittal on the greater offense. If a verdict of guilty on the lesser offense is recorded and the jury discharged without having rendered any verdict on the greater offense, a retrial on the greater offense is barred under [Penal Code] section 1023, regardless of whether the jury expressly deadlocked on that charge." (*Ibid*.) Moreover, "[w]hen the jury is instructed on the acquittal-first rule and hangs on the more serious offense, the prosecution is put to a choice: It may either move for a mistrial and set the entire matter for a retrial [citations], or, if it wishes to accept a verdict on the lesser charge and forgo a chance to convict on the greater, the prosecution may ask the court to dismiss the greater charge in the interest of justice [citation]. [Citation.]" (*People v. Anderson* (2009) 47 Cal.4th 92, 114.) "[T]he whole point of the . . . rule is to provide a procedure whereby the jury's intent is clear, and legitimate interests of both the defendant and the People are honored." (*Id.* at pp. 114-115.) In this case, it does appear that an acquittal first instruction was not given. Although the trial court erred by not instructing with CALCRIM No. 640, concerning completing verdict forms when more than one degree of murder is possible, the error cannot possibly have had any effect on the jury's understanding regarding the definition of second degree murder.

V.      *Cumulative Error*

Appellant contends that the cumulative impact of all of the above errors deprived him of a fair trial. We have either rejected appellant's claims of error and/or found that any errors were not prejudicial. Viewed cumulatively, we find that any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

38

*Disposition*

The judgment is affirmed.

_____

ELIA, Acting P. J.

I CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

MÁRQUEZ, J., Dissenting.

I respectfully dissent. I agree with the majority that a trial court has a duty to instruct on all theories of a lesser included offense that are supported by substantial evidence. (Maj. opn. at p. 11.) But I disagree with the majority's conclusion that there was no substantial evidence supporting the need for a "heat of passion" voluntary manslaughter instruction in this case. (*Id.* at p. 22.) Indeed the jury, during its deliberations, inquired whether voluntary manslaughter was still on option for their consideration.[1] Notwithstanding trial counsel's renewed plea to include a voluntary manslaughter instruction, "especially now that the jury is asking about it," the trial court convened the jury in the courtroom and instructed that "[m]anslaughter is not an option." By denying Gibson's requests for this instruction, the trial court violated his due process rights and arrogated the jury's role to itself.

To be clear, were defendant challenging a jury conviction of first degree murder on the basis of insufficient evidence, I would readily reject that claim. The evidence adduced at trial was sufficient to support a first degree murder conviction. But the jury here could not agree on a conviction of first degree murder. And it was precluded—erroneously, in my view—from considering the lesser included offense of voluntary manslaughter, having to choose, instead, between murder and acquittal. This was error. And it was prejudicial, as the record is sufficient to establish the possibility of a more favorable outcome absent this error. For this reason, I would reverse Gibson's conviction and remand this matter for a possible retrial with a jury instructed on all theories of criminal liability substantially supported by the evidence, including voluntary manslaughter.

---

[1] It is not surprising the jury inquired about voluntary manslaughter. As Gibson's trial counsel made clear in his opening statement, heat of passion was the sole basis for Gibson's defense.

1. *The Jury's Fact Finding Role*

"[T]rial by jury in criminal cases is fundamental to the American scheme of justice. . . ." (*Duncan v. Louisiana* (1968) 391 U.S. 145, 149.) "[T]he jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (*Id.* at p. 156.)

Furthermore, it is the role of the jury—not of the court—to act as fact finder. "[T]he English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offense. [. . .] Throughout its history, the jury determined which homicide defendants would be subject to capital punishment by making factual determinations, many of which related to difficult assessments of the defendant's state of mind. By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned." (*Walton v. Arizona* (1990) 497 U.S. 639, 711 (dis. opn. of Stevens, J.) [quoting Welsh S. White, *Fact-Finding and the Death Penalty: The Scope of A Capital Defendant's Right to Jury Trial* (1989) 65 Notre Dame L. Rev. 1, 11].)

By refusing a jury instruction where substantial evidence requires it, a trial court undermines the jury's role in our system of justice, denying both defendant and jurors their lawful rights.

2. *The Legal Standard Requiring Instruction*

When a defendant is charged with murder, the trial court has a sua sponte duty to instruct on voluntary manslaughter if a reasonable jury could find the defendant committed manslaughter due to a sudden quarrel or heat of passion. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Specifically, heat of passion is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v.*

2

*Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) "[T]he provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Id.* at p. 949.) The duty to instruct may arise even if the evidence shows the defendant intended to kill. (*Breverman* at p. 163.) However, the provocation is not required to be so great as to be "of a kind that would cause an ordinary person of average disposition *to kill*." (*Beltran* at p. 935.)

The provocation requirement has two components, i.e., " 'both an objective and a subjective component. [Citation.] First, the defendant must actually, subjectively, kill under the heat of passion.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) The passion aroused need not be anger or rage, but may be any violent, intense, high-wrought, or enthusiastic emotion other than revenge. (*Breverman*, *supra*, 19 Cal.4th at p. 163.) " 'But the circumstances giving rise to the heat of passion are also viewed objectively. As [the California Supreme Court] explained long ago . . . , "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." ' [Citation.]' " (*People v. Manriquez*, *supra*, at p. 584.)

No specific type of provocation is required. (*Breverman*, *supra*, 19 Cal.4th at p. 163.) Legally sufficient provocation may be entirely verbal, including words of abuse, insult or reproach. (*People v. Valentine* (1946) 28 Cal.2d 121, 140; *People v. Le* (2007) 158 Cal.App.4th 516, 526.) Courts have also abandoned the rule that "trespass against lands or goods" may not form sufficient provocation. (*People v. Valentine*, *supra*, 28 Cal.2d at p. 140.)

Under *Beltran*, the trial court applied the wrong standard in denying the requested instruction. The trial court considered whether the evidence of provocation was sufficient

3

to "raise a killing instinct" or "cause a reasonably objective individual to react with [. . .] killing passion." Our Supreme Court explicitly rejected that standard. "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act." (*Beltran*, *supra*, 56 Cal.4th at p. 949.)

Here, the majority opines that if the evidence of provocation was sufficient to provoke a reasonable person, "we would see a greater correlation between the divorce rate and the homicide rate." But the provocation need not be so great as to cause a reasonable person to commit homicide; that is the wrong standard. (*Beltran*, *supra*, 56 Cal.4th at p. 935.) The provocation is sufficient if it would cause a reasonable person to act "not out of rational thought but out of unconsidered reaction to the provocation," even if a reasonable person would *not* kill under those circumstances. (*Id.* at p. 942.) Application of the standard should therefore ignore the fact of the homicide, and focus solely on whether a reasonable person would be sufficiently provoked to act without reason or consideration. Under the circumstances presented to Gibson, I find that standard satisfied.

3. *Substantial Evidence of Heat of Passion*

A trial court must instruct the jury on heat of passion provocation if "substantial evidence" supports the instruction. Substantial evidence is evidence from which a jury composed of reasonable persons could conclude that the defendant committed voluntary manslaughter, but not murder. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Id.* at p. 177.) In particular, "courts should not evaluate the credibility of witnesses, a task for the jury." (*Id.* at p. 162.) "The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

4

The evidence was more than sufficient to require an instruction on voluntary manslaughter. First, with respect to the subjective component of heat of passion, Gibson presented considerable evidence of his irrational state of mind before he killed his wife. He consistently stated—in both the police interviews and in trial testimony—that he fell into a state of panic and rage just before strangling his wife. Gibson's statements, corroborated by abundant testimony from his co-workers and colleagues, showed that his state of mind was the result of accumulated pressure over the course of the preceding week or so, during which work- and marital-related stress had deprived him of sleep and made him despondent. This evidence is sufficient to establish the subjective component of heat of passion.

With respect to provocation, Gibson contends he was provoked through the combined effect of two statements by his wife—that she was leaving him, and that she had transferred their money out of their bank account to her family overseas. On the day of the killing, he repeatedly told his wife throughout the day that he did not want to undertake the trip to the Philippines. She said she would go with or without him, and the volume of baggage she was packing suggested to Gibson that she did not plan to return to the United States. Just prior to the crime, his wife was sitting on the bed with her laptop and "going over some figures." When he asked what she was doing, she said she was transferring all of their funds to an account held by her family.[2] Gibson testified that "[s]he pressed . . . a button and . . . said, Now we have no money in our account."

On cross-examination, defendant expanded on this point:

_____

[2] Defendant had never performed online banking himself and had limited computer knowledge generally. His wife did all of the couple's online banking. As the majority notes, on cross-examination the defendant was apparently shown an account statement that showed no transfer on the date in question. However, the document itself is not part of the record. Without weighing the credibility of defendant's testimony, we must consider whether the supposed transfer constitutes conduct that was "reasonably believed by the defendant to have been engaged in by the victim." (*People v. Souza* (2012) 54 Cal.4th 90, 116.)

5

"Q. Okay. And then, when you said she transferred funds, did she—was she on the bed or was she somewhere else?

"A. I believe she was right on the bed next to me.

"Q. So, how did she do that?

"A. With her laptop.

"Q. Okay. And then, what did you see her do?

"A. She was telling me this is what we're going to do with our funds, we're going to transfer it.

"Q. To what?

"A. To her family's account.

"Q. Where?

"A. I'm not sure, ma'am.

"Q. Okay. Well, was she doing something with the computer?

"A. Yes. She was putting our account number that showed our balance, and then all of a sudden the balance was wiped out.

"Q. You saw that?

"A. She showed me.

"Q. And you saw that on the screen?

"A. Yes."

This enraged him. He felt that without his money "I couldn't survive." He regarded her action as "payback" and "retribution" "for the way I was in the past." On hearing about the alleged transfer of funds, he had a "[p]anic attack" and "assaulted her," "choked her," and "stabbed her." On cross-examination, Gibson testified that when he asked her why she had transferred their funds, she told him that she was leaving him. As a result,

Gibson "felt I was out of control" because "I was losing everything that was important to me."[3]

Gibson contends this "dual provocation" is sufficient to meet the objective component of provocation sufficient for heat of passion. The facts here are comparatively unique under the case law governing such provocation. The classic example involves a spouse committing adultery. Gibson compares his wife's threat to remove herself from the relationship with examples of infidelity that are discussed in the case law.

In some cases, the facts share some similarity to Gibson's situation. For example, in *People v. Berry* (1976) 18 Cal.3d 509, a husband killed his wife in a rage following two weeks during which the wife taunted the husband with her involvement with another man while she had visited Israel. She told her husband that her lover was coming to America to claim her, and that she wanted a divorce. (*Id.* at p. 513.) Despite the extended period of time over which the provocation arose, the court held this conduct to be sufficient provocation, and the court reversed the conviction based on the trial court's failure to instruct the jury on voluntary manslaughter. (*Id.* at p. 518.)

Loss of property may also be a contributing factor in heat of passion provocation involving marital fidelity. In *People v. Le*, *supra*, 158 Cal.App.4th 516, a husband killed his wife's lover after an extended period of infidelity. The wife in that case had loaned her lover $10,000. (*Id.* at p. 519.) The defendant cited both acts—infidelity and the $10,000 loan—as reasons for the killing. (*Id.* at p. 522.) Although the trial court instructed the jury on voluntary manslaughter, the court erroneously instructed the jury that "mere words" are not a defense to battery, and the court permitted the prosecutor to argue that words alone cannot form sufficient provocation. (*Id.* at p. 518.) The jury convicted the defendant of second degree murder. In reversing the conviction, this court

---

[3] Defendant stated in his probation interview that he believed the account held funds for his daughter's college education.

found it reasonably probable that the jury would have convicted the defendant of voluntary manslaughter. (*Id.* at p. 529.)

Loss of property may also factor into provocation in other contexts, apart from marital infidelity. In *Breverman*, *supra*, 19 Cal.4th 142, a group of attackers, seeking retribution for a prior fight, approached the defendant's residence while the defendant was inside. (*Id.* at p. 150.) The attackers began beating the defendant's car with clubs and sticks, setting off the car alarm. The defendant began firing a gun from inside his residence, and the attackers fled. One of the fleeing attackers was shot and killed. The defendant stated that he fired at the attackers because they had damaged his car, and he was trying to stop them. (*Id.* at p. 151.) He also insisted that he thought they were trying to enter his home to kill him. The trial court instructed the jury on voluntary manslaughter on a theory of imperfect self defense, but not on a theory of heat of passion. (*Id.* at p. 152.) The California Supreme Court held this was error. (*Id.* at p. 164.) In its analysis, the high court noted the attackers' trespass on the defendant's property and the attack on his car, as well as the fear and panic the attack instilled in the defendant's mind. (*Id.* at p. 163.) The prosecution asked the court to hold that mere vandalism to an automobile is never sufficient provocation, but the court declined to do so, noting that the facts underlying the provocation went beyond mere destruction of property. (*Id.* at p. 164, fn. 11.)

Loss of property also factored into heat of passion provocation in *People v. Dewberry* (1959) 51 Cal.2d 548. In that case, the defendant placed a large sum of money on a bar counter. He then shot another customer after failing to have all of it returned to him. The defendant was convicted of second degree murder, following instructions in which the trial court instructed on voluntary manslaughter but refused a defense request to instruct that the jury was required to convict him only of voluntary manslaughter if it had a reasonable doubt about his guilt of murder. (*Id.* at p. 554.) The Supreme Court concluded, "[w]hile there was sufficient evidence to support a conviction of second

degree murder, a finding that the offense was manslaughter would be equally warranted. . . . [T]he jury . . . was . . . presented with substantial evidence of provocation, much of which was undisputed, that would support a finding of voluntary manslaughter. [Citation.] [The victim] had taken defendant's money and only returned part of it, passing the rest to his wife. Defendant could reasonably conclude that [the victim] intended to steal his money, and he testified that [the victim] made a menacing gesture toward him and told him that if he did not shut up he would lose more than his money. Defendant was entitled to have this evidence considered in the light of the rule of reasonable doubt, not only on the issue of self defense, but also on the issue of provocation sufficient to reduce the killing from second degree murder to manslaughter." (*Ibid.*)

I acknowledge that Gibson's "dual provocation" theory—that he was provoked both by his wife's threat of leaving and her transfer of the money in their joint banking account to her family in the Philippines—does not fit neatly into the factual patterns of existing case law. But it is also true that none of the cases above squarely foreclose the sufficiency of the provocation here, and several of them contain elements common to these facts. Regardless of the various factual patterns found in the case law, no specific type of provocation is required. (*Breverman*, *supra*, at p. 163.) The sole question here is whether there is substantial evidence of provocation such that an ordinary person of average disposition would be liable to act rashly or without due deliberation and reflection. (*Beltran*, *supra*, at p. 957.) Gibson's statements and testimony provide substantial evidence to show that he reasonably believed his wife had transferred their money to her family, and that she had informed him of her intention to leave him. I would find this provocation sufficient to cause an ordinary person to act rashly or without deliberation and reflection.

Accordingly, I conclude that the trial court's denial of Gibson's request for a voluntary manslaughter instruction was erroneous under state law.

9

4. *Reversal*

To warrant reversal, Gibson must show prejudice—that is, he must show the possibility of a more favorable outcome in the absence of error.[4] The record includes sufficient evidence that reasonably could have persuaded the jury to reject the murder charges in favor of voluntary manslaughter. Most significantly, Gibson made numerous statements demonstrating heat of passion in his interviews with police at the hospital. Gibson consistently stated several times that he killed his wife after falling into a state of panic and rage. His trial testimony was consistent with these claims. Gibson also said that his state of mind was the result of a combination of factors. In the days before the crime, he was under a great deal of stress resulting from his job at Soledad Prison. He found his work situation so unbearable that he volunteered for a demotion. He was unable to sleep, and the situation was causing him insecurity in his ability to support his family financially. His relationship with a former girlfriend was also causing stress in his marriage. The tension between Gibson and his wife was exacerbated by the logistical difficulty of preparing for the trip to the Philippines on short notice. According to Gibson, all of these factors culminated in a rage-filled panic attack triggered by his wife's threat to leave him and his belief that she had transferred all of the money from their bank account to her family in the Philippines.

A jury could reasonably conclude that Gibson was not trying to deceive or trick the police in these interviews.[5] Gibson readily admitted many incriminating details of the crime, including the fact that he had contemplated killing his wife earlier in the week. These admissions are inconsistent with any attempt to absolve himself falsely.

---

[4] Because I would reach this conclusion under either the federal or state law standard for evaluating prejudice, I will not discuss which is required here.

[5] The jury clearly considered the interviews, as demonstrated by its note to the court asking to hear the audio of the recording during deliberations.

Additionally, numerous friends and colleagues corroborated Gibson's statements concerning his state of mind in the days before the killing. Gibson worked in the administrative segregation or "ad seg" unit at the prison. Benjamin Curry, the prison warden, testified that prisoners were placed in administrative segregation if they presented a direct threat to the safety of others. Gibson's co-worker, Karen Gragson, testified that the unit was where "they'd put all the tough guys." Carla Plymesser, Gibson's supervisor, described his position as stressful and overwhelming. Gibson was forced to handle a "huge caseload" due to recent vacancies that had doubled the number of cases he was assigned. Victoria Berry, Gibson's friend and tax return preparer, described his work situation as a "pressure cooker."

These witnesses uniformly testified that Gibson's demeanor had changed markedly in the days before the crime. Berry testified that Gibson was normally a "happy-go-lucky" person, but that the happiness had drained out of him, and he told her "his job was killing him." She was worried that he would suffer a heart attack or stroke. Gragson testified that Gibson would not talk to her, and that he appeared overwhelmed and "didn't look like himself." Cathelene Tucker, another co-worker, testified that "It wasn't the same individual." Gibson was no longer smiling, and appeared preoccupied. Curry, the warden, testified that Gibson called him a couple days before the crime. Gibson sounded upset and emotional. He told Curry that he "didn't want to be a burden to anyone," and he wanted to be demoted from his counselor position to correctional officer. Plymesser, Gibson's direct supervisor, testified that he requested time off one week before the crime because "he had hit the wall" and needed to "separate himself from being at work."

Numerous witnesses uniformly described Gibson as being a peaceful, nonviolent, and gentle man prior to the crime.[6] Tucker, Gibson's co-worker, described him as a

---

[6] The defendant has no record of any prior convictions.

11

"gentle giant" who was extremely friendly, nonaggressive, and timid.  Tucker, Plymesser, and Dustin Smith, Gibson's friend of forty years, all testified that he was known as a "big teddy bear."  Berry testified that "we trusted our children with him."  Another friend described him as "playful" and "happy-go-lucky."

Given the nature and consistency of the testimony from these witnesses, the jury could reasonably have concluded that Gibson's subjective state of mind in the days and hours leading up to the crime, compared with his general demeanor prior to these events, was consistent with his acting rashly and without reflection during the killing.

The jury also could have concluded that Gibson reasonably believed the victim engaged in conduct constituting heat of passion provocation.  With respect to his wife leaving him, Gibson testified that the large volume of items they were preparing to pack—four boxes holding ninety pounds each—signaled to him that she did not intend to return.  Crime scene investigators found that the victim's purse contained about $900 in U.S. currency and an unspecified amount of Philippine currency.  With respect to Gibson's testimony that his wife had transferred the contents of their bank account to her own family, he also testified that he had limited experience with computers, and he had no experience with online banking.  He testified that his wife was responsible for the account.  At some point after his wife took over responsibility for the checking account, he discovered that she was only paying interest, but no principal, on the mortgage for their condominium.  Considering this evidence, together with the consistency between Gibson's testimony and his statements in interviews with the police, the jury could have found that he reasonably believed his wife had effected the transfer and told him she intended to leave.

I readily acknowledge the record contains much evidence weighing against heat of passion.  Significantly, in his interviews with police, Gibson admitted that he contemplated killing his wife earlier in the week, which would support a finding of premeditation.  But the existence of some evidence supporting premeditation would not

12

preclude the jury from finding heat of passion. In *Le, supra*, 158 Cal.App.4th 516, the defendant lay in wait for half an hour with a knife hidden in his waistband. (*Id.* at pp. 521-522.) He called his friends and relatives to bid them farewell and tell them he would be put in jail. Nonetheless, this court rejected the prosecution's assertion of harmless error and found it reasonably probable that the jury would have reached a more favorable outcome had it been instructed properly. (*Id.* at p. 529.)

I also acknowledge the violence that Gibson inflicted on the victim after her death. But the jury could have found such behavior consistent with a state of rage. Notably, Gibson attempted to kill himself soon after the crime. The jury could have reasonably inferred that his behavior throughout the entire evening arose from a persistently irrational state of mind.

Finally, the fact that the jury, on its own initiative, asked the trial court if it could consider voluntary manslaughter suggests it is reasonably probable the jury may have arrived at an outcome more favorable to Gibson. After the court instructed the jury that it could not consider manslaughter, the jury remained focused on Gibson's state of mind. In one note, the jury requested clarification of the mens rea requirement, asking, "We would like you to please give us some examples of the statement 'acted deliberately, if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.'" In another note, the jury asked, "If someone kills another *without premeditation*, leaves, then returns to scene [*sic*] because he is unaware that the victim is dead, then commits further acts willfully, deliberately and with premeditation to kill the victim, can this qualify as 1st degree murder?" (Emphasis added.) The jury remained undecided on the issue of premeditation, which suggests that at least one juror believed that Gibson acted without premeditation. These events show it was reasonably probable that at least one juror could also have found Gibson acted out of heat of passion, resulting in a hung jury and a mistrial.

13

The majority points to the evidence of malice aforethought and the fact that the jury continued to deliberate for 17 hours after the court instructed that voluntary manslaughter was not an option, suggesting that the jury considered premeditation at length. As noted earlier, I acknowledge that the evidence was sufficient to support a first degree murder conviction. If defendant were challenging such a conviction on the basis of insufficient evidence, I would readily reject that claim because governing evidentiary standards afford great deference and latitude to the jury, designed to " 'ensur[e] that the jury will consider the full range of possible verdicts' included in the charge. . . ." (*Breverman*, *supra*, 19 Cal.4th at p. 155.) In this case, however, the full range of possible verdicts included voluntary manslaughter, an option the trial court erroneously precluded the jury from considering.

5. *Conclusion*

Taking the record as a whole, the evidence establishes a reasonable probability that a jury could have reached a more favorable outcome for defendant (i.e., a hung jury) had the court properly instructed them with a voluntary manslaughter instruction based on heat of passion. While much of the evidence weighs against heat of passion, the evidence to support it is substantial. More importantly, it was the province of the jury—not the court—to weigh this evidence. I would reverse the conviction and remand this matter for a possible retrial on all theories of criminal liability substantially supported by the evidence, including the lesser included offense of voluntary manslaughter based on heat of passion.

Márquez, J.

14