[Crim. No. 6216.   In Bank.   May 16, 1958.]

THE PEOPLE, Appellant, v. WALTER G. BOR-
CHERS, JR., Respondent.

322

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, William B. McKesson, District Attorney (Los Angeles), Jere J. Sullivan, Fred N. Whichello and Lewis Watnick, Deputy District Attorneys, for Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), James P. Nunnelley and Richard F. Bird, Deputy Public Defenders, for Respondent.

SCHAUER, J.—The People appeal "from an Order of the Superior Court . . . modifying the verdict in the above entitled cause by reducing the punishment imposed." (Pen. Code, § 1238, subd. 6.) Defendant does not appeal. A jury found defendant guilty of murder of the second degree and found that he was sane at the time of the commission of the offense. The trial judge denied defendant's motion for a new trial on the issue of sanity and ordered that "Defendant's motion for new trial on the case in chief is ruled upon as follows: In lieu of granting a new trial, the verdict of second degree Murder is reduced to Voluntary Manslaughter." The People argue that the evidence was sufficient to justify the implied finding of malice aforethought, that the evidence did not show that defendant was guilty of voluntary manslaughter, and that the trial court erred in reducing the class of crime found by the jury. We have concluded that no ground for reversal is shown.

Defendant, a Pasadena insurance broker, aged 45, met deceased, referred to throughout the testimony as "Dotty," aged 29, at a zoo on May 13, 1956. With Dotty was Tony, an illegitimate child of four whom Dotty had cared for since 16 days after his birth. Defendant was attracted by the "warmth," "kindness," and "sweetness" with which Dotty spoke to the child. Defendant spoke to the boy and thus became acquainted with Dotty. They had dinner together that night and thereafter, according to defendant's testimony, "went together steadily from then on" until he killed her on October 9, 1956. From May 13 until October 9 "excepting the days that I was away on a business trip to Mexico and one other day, . . . there was not a day that went by but what Tony and Dotty and I saw each other."

In March, 1955, defendant's wife had filed suit for divorce while defendant was in South America. On his return a "temporary experimental reconciliation was effected" but on December 1, 1955, the Borchers finally separated. In February,

1956, defendant, accompanied by Mrs. Borchers, "initiated the action in which I asked for the divorce from her."

On May 22, 1956, nine days after defendant's meeting with Dotty, they became engaged. Defendant testified that "Dotty was a very independent person. She finally admitted to me, although it was under duress, that she was having very serious financial problems." Nevertheless she permitted defendant to make payments on her car, to establish her and Tony in a "comfortable, pleasantly furnished apartment" in Pasadena, and to take her to Las Vegas.

In Las Vegas Dotty "froze in her tracks" when she saw a man whom she identified as "Lard Bucket," a well known gambler who was a friend of "Chicken Louie," Dotty's former husband.

The next day, May 28, in Las Vegas Dotty had her hair dyed red. That afternoon defendant said, "I wish we didn't have to wait so long for our marriage." After some discussion Dotty said that "committing bigamy . . . wasn't a good idea." They bought a wedding ring and "had a lot of fun reciting our little common-law marriage ceremony, if you want to call it that, and we said our vows one to the other."

On their return to Pasadena defendant opened a bank account for Dotty. She pawned some jewelry and put the proceeds in the account but defendant later "paid them off." Defendant gave her power of attorney to draw checks on his bank accounts, including his business account. He caused insurance in an amount of about $85,000 to be made payable to "Dotty for her lifetime the interest in that and to Tony if he survived her." He consulted his attorney "to get papers cleared for Tony's legal adoption."

About September 2 defendant engaged a private detective, Mr. Fagg, to investigate the "background and associates" of Marvin Prestridge and Nick Cascio. These men had criminal records and were "hanging around" Dotty and using her automobile. Fagg told defendant "that I was dealing with . . . big-time hoodlums, and I was way over my head, . . . and I ought to get out, and furthermore he said I was . . . being set up for a possible murder for insurance. I laughed at him." Defendant in his testimony repeatedly emphasized his devotion to Dotty and his complete disbelief that she was plotting against him with the "hoodlums."

Although defendant declared his complete love for and implicit trust in Dotty, he sometimes remained outside her

apartment and on several occasions observed a man enter the apartment after he had left it.

Defendant believed that Prestridge "used the fear that he held over Dotty to demand sexual relations with her." She admitted such relations with Prestridge. Defendant testified that Dotty told him she was trying to help Prestridge "because she was very fond of his mother, and she said that relationship got out of hand because of his demands, and there was an understanding."

About three weeks before the killing Dotty, with defendant's help, moved to another apartment. Although defendant repeatedly testified that he never had an argument with Dotty, a neighbor testified that she heard Dotty scream at and curse defendant.

Defendant answered affirmatively a question whether Fagg, before October 5, 1956, told defendant in substance, "I am going to have to be brutal with you in order to get you to realize that your life may be in jeopardy. My investigation does not indicate that Dotty is in any way being forced to sleep with Prestridge. Quite the contrary. She does it because she wants to, and, furthermore, Prestridge has a Dallas police record as a pimp, among other things, and Dotty is taking money from you and giving it to Prestridge."

On October 5, 1956, defendant and Dotty drove to San Diego. On the way back she was very morose. She said that she wished she were dead and that "These men will stop at nothing," and she attempted to jump from the car as they were driving.

Defendant testified in detail to the events surrounding the killing. Also in evidence were the testimony of a police officer to an oral statement of defendant made two days after the killing (which defendant testified was accurate), a typewritten statement signed by defendant, and the testimony of Fagg, to whom defendant described the killing.

On the evening of October 9 defendant and Dotty left Tony with a baby sitter and at about 7 o'clock went to a restaurant. "It was a particularly happy evening at that point." After drinks and dinner, at about 9:30, they went for a drive. Dotty "became very pensive, not speaking too much, and then when she did decide to talk she was talking about Tony and adoption again." She expressed fear, as she repeatedly had in the past, that she would not be allowed to adopt the child. "She made the suggestion that . . . if the two of us couldn't be happy because of our problem she would commit suicide

and wanted me to shoot Tony. I told Dotty without Tony and without her, as far as I was concerned, there was nothing. At this time I couldn't seem to lift her out of her mood." Dotty took the key from the ignition as they were driving, unlocked the glove compartment, and took out defendant's .32 caliber automatic pistol. "[S]he actuated the slide on the automatic and at that time the cartridge was ejected from the chamber and a live one replaced in the chamber by the actuation of the slide and . . . Dotty replaced the ejected cartridge into the clip of the gun."

Defendant testified that Dotty held the gun "not threateningly pointed at him," but he told Fagg that "She did point the gun at him and told him he better stop the car, she was going to shoot him. Then she pointed it at herself." She discussed suicide with defendant and stated that she wanted defendant to shoot her and Tony and himself. Defendant "attempted to work her out of this trend of thought." She held the gun on the seat of the car and defendant put his hand "very carefully" over her hand which held the gun. Dotty withdrew her hand. She again said that defendant should kill her, Tony, and himself. "[S]he put her head on my shoulder and she kissed my cheek and she straightened back up to a sitting position, and when she leaned over to kiss me I had put my arm with the gun in it on the back . . . of the seat. I had thought of throwing it in the back, but I didn't want to throw it back there, and I didn't want to make too much of a point so that she would feel I actually tried to take the gun away from her. I was trying to do it as carefully as I could. But I didn't throw it in the back seat and if I only had." The car was moving during all this time. Defendant held the gun pointed at the back of Dotty's head. She turned to him and said, "Go ahead and shoot, what is the matter, are you chicken." She turned away. Defendant heard the explosion of the gun as he shot Dotty in the back of the head and Dotty fell over in the seat with her head by defendant's right leg.

Defendant saw a car behind him and, frightened because he thought it might be the police, slowed down until it drove past. Dotty was "moaning very softly."

As defendant drove on a near accident with another car occurred. The driver of the other car testified that Dotty's hands "were hung on the horn and the horn was sounding." Both cars came to a stop. Defendant "pulled her hands out and then sped away. He pushed her down in the floorboards when he drove on and sped away."

Defendant then drove to his office but when he arrived there he saw an automobile and a man whom he feared was Cascio coming from it so he drove on. He returned to his office but the same car was there and again he drove on. He believed the other car followed him but eventually he eluded it.

Dotty was still moaning so defendant stopped at a deserted spot and "to put her out of her misery" he struck her on the head with the gun. He held her and tried to talk with her and finally became aware that she was dead. The bullet wound in the back of her head made death inevitable; the skull fracture from the blow with the gun may have accelerated death.

Defendant put Dotty's body in the trunk of his car. He drove 140 miles to a camp site with which he was familiar, reaching it about daylight. Defendant drove to the camp site with the thought of shooting himself. He fell asleep in the trunk compartment beside her body. When he awoke defendant took the engagement ring from Dotty's finger. He drove to a filling station, bought gasoline, washed his hands, on which there was blood, and ate.

Defendant drove to a post office where he bought four $100 money orders. He told the woman who sold him the money orders that he bought them because he planned to go on a hunting and fishing trip to Mexico. He subsequently told a police officer that he bought the money orders because he planned to commit suicide and did not want cash found on his body. Defendant then ate lunch and drove back to Pasadena. On his way to Pasadena he telephoned Mr. Fagg and made an appointment to meet him in Arcadia at 9 in the evening.

Defendant drove to his home, took a shower, and changed his clothes. He gave the engagement ring which he had taken from Dotty's finger to his wife for safekeeping. He ate and then drove to meet Fagg in Arcadia. He and Fagg drove in their respective cars to Fagg's home. They talked for an hour or more, discussing the fact that Fagg had been looking for defendant for several days and that Dotty had been reported as a missing person. Suddenly defendant said, "Well, you don't have to look for Dotty any more, her body is in my car." Then defendant related to Fagg the circumstances of his killing of Dotty.

Section 1181, paragraph 6 of the Penal Code provides that the trial court may grant a new trial "When the verdict . . . is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of

which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial . . .''

The trial court in ruling on the question of reducing the class of the crime stated that in its opinion there was ''a duty fixed on the trial court to independently weigh and consider the testimony and all of the ramifications of it and determine in his own mind if he is satisfied that the evidence beyond a reasonable doubt shows guilt of second degree murder. Tested in that light and tested further in the light of the evidence of the psychiatrists on the mental condition of this defendant, I am not satisfied that the evidence is sufficient to sustain the finding of malice to make this second degree murder; hence, the Court in lieu of granting a new trial will reduce the degree to that of voluntary manslaughter.''

■ In passing on a motion for new trial it is not only the power but also the duty of the trial court to consider the weight of the evidence. (*People* v. *Robarge* (1953), 41 Cal.2d 628, 633 [4], [5] [262 P.2d 14] ; *People* v. *Sarazzawski* (1945), 27 Cal.2d 7, 15 [7] [161 P.2d 934].) ■ The power and duty of the trial court in considering the question of the reduction of the class or degree of the crime are the same. (*People* v. *Sheran* (1957), 49 Cal.2d 101, 109 [6] [315 P.2d 5].)

■ In a criminal trial the burden is upon the prosecution to prove beyond any reasonable doubt every essential element of the crime of which a defendant is to be convicted. ■ Here, from the evidence viewed as a whole, the trial judge was amply justified in concluding that defendant did not possess the state of mind known as ''malice aforethought'' which is an essential ingredient of murder. (Pen. Code, § 187.) ''Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'' (Pen. Code, § 188.) Voluntary manslaughter is ''the unlawful killing of a human being, without malice . . . upon a sudden quarrel or heat of passion.'' (Pen. Code, § 192.)

From the evidence viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of ''passion'' by a series of events over a considerable period of time: Dotty's admitted infidelity, her statements that she

wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, Tony, and himself on the night of the homicide, and her taunt, "are you chicken." █ As defendant argues persuasively, "passion" need not mean "rage" or "anger." According to dictionary definition, "passion" may be any "Violent, intense, high-wrought, or enthusiastic emotion." (Webster's New International Dictionary, 2d ed.) █ As stated in *People* v. *Logan* (1917), 175 Cal. 45, 49 [164 P. 1121], quoted with approval in *People* v. *Danielly* (1949), 33 Cal.2d 362, 377-378 [202 P.2d 18], and *People* v. *Valentine* (1946), 28 Cal.2d 121, 139 [169 P.2d 1], "the fundamental of the inquiry [in determining whether a homicide is voluntary manslaughter] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion —not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." It may fairly be concluded that the evidence on the issue of not guilty supports a finding that defendant killed in wild desperation induced by Dotty's long continued provocatory conduct.

█ There was evidence that there were spermatozoa in the vagina of deceased and that defendant had had a vasectomy so that he could not have been responsible for this. From this evidence, the People argue, a motive for the killing may be inferred. Defendant suggests that this is evidence of provocation which would make the killing manslaughter. However, even if we assume, *arguendo*, that our function might include reviewing which of the two inferences the trial judge should have drawn, we need not make such determination, because there is no evidence whatsoever that defendant had any knowledge that Dotty had had intercourse with a person other than himself shortly before the killing. Hence it does not appear that this particular evidence should enter into an appraisal of the class of the homicide.

█ A problem is presented by the statement of the trial judge that in reducing the class of the offense he considered "the evidence of the psychiatrists on the mental condition of this defendant." This evidence of the psychiatrists was not before the jury when they found defendant guilty of second degree murder; it was presented only on the trial of the issue of not guilty by reason of insanity. Nevertheless, we conclude

that this statement of the trial judge should not be used to impeach his reappraisal of the evidence in the case in chief. The latter fully supports the order and the testimony of the psychiatrists is in effect merely cumulative to the result.

The trial judge here is to be commended for his diligent alertness to the power and duty, reposed *only in trial courts,* to reappraise the weight of the evidence on motion for new trial. He very properly showed no hesitance in reducing the class of the homicide in the light of his determination, supported by a reasonable view of the evidence, that there was no sufficient showing of malice aforethought. Such unhesitant exercise of this power by the trial judge, when he is satisfied that the action is indicated by the evidence, not only makes for justice in the individual case but tends also to lighten the burden of reviewing courts and to expedite the finality of judgments.

For the reasons above stated the order appealed from is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Spence, J., and McComb, J., concurred.