Filed 6/2/16  P. v. Vasquez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B258147 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA407583) |
| v. | |
| JOSE S. VASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Los Angeles Superior Court, Anne H. Egerton, Judge.  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Apellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Nathan Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose S. Vasquez contends his constitutional right to due process was denied when the trial court refused to give his proposed pinpoint instructions. The trial court properly rejected defense-proffered instructions that simply repeated instructions that the court had already decided to give. Accordingly, we hold that the jury was properly instructed and affirm the judgment.

## BACKGROUND

Vasquez stabbed the victim, Roxana Varela, to death, in front of their two daughters, C.[1] and L.[2]

C. testified that she lived with her mother, Varela, and her father, Vasquez, along with her younger sister, L. C. testified that her parents always argued. Just before 7:00 a.m., on the morning of February 5, 2013, C. awoke to her mother's screaming in the apartment bathroom. She and her younger sister went to the bathroom where they saw Vasquez stab Varela with a knife. When Varela screamed, Vasquez covered her mouth. C. tried to stop Vasquez by biting and then pushing him. Vasquez pushed C. out of the bathroom, injuring her ankle, and slammed the door. C. called 911 and led her sister outside, where they continued to hear their mother's screams. When police arrived, the screaming stopped.

Officer Javier Borrego testified that, having been informed that the victim was inside the apartment with her attacker, he and his team broke down the door. They discovered that a sofa or armchair had been pushed up to block the door. When he got to the bathroom, he saw blood seeping under the door. The officers identified themselves in English and Spanish and then pushed the door open. Varela, in a bra and jeans, was on the floor, "motionless, very pale, with flesh wounds." Officer Borrego then saw Vasquez and called out to him in Spanish. Investigating Officer Detective Ray Martinez testified that, when he arrived, he saw that Vasquez was covered with blood. Officer Frank

---

[1] At the time she testified at trial, C. was about to start middle school.

[2] At the time of trial, L. was about to enter second grade.

2

Garcia testified that he recovered two knives near Varela's body. The smaller knife was missing its tip.

Deputy Medical Examiner (DME) Pedro Ortiz of the Los Angeles County Department of the Coroner testified that Varela died as a result of multiple sharp force injuries. He counted 36 distinct injuries; six were fatal. DME Ortiz found numerous defensive wounds on her hands and arms. He also found a piece of a stainless steel knife on her skull.

Vasquez testified on his own behalf. He testified that he and Varela began living together in 2002. Their relationship began to deteriorate in 2010. She would get angry when he called her on her cell phone and rejected his romantic advances. She no longer responded to his kisses or allowed him to hold her hand in public. He came to believe that she was seeing someone else. He testified that he saw her doing something unusual one day before she left for work; she took an "additional bag" and placed undergarments in it. Vasquez also testified that he saw "odd" marks and stains in the car that only Varela drove; he saw "handprints on the passenger seat"; "stains on the front driver's seat"; and streaks or "scratchings" on the dashboard. When he and Varela attended a party on December 29, 2012, Vasquez observed a young man give Varela "certain looks that were, like very loving and very—that showed a lot of desire." Varela told him to get a blanket for the girls from their car; when he returned, he could not find her anywhere. Later he saw her leave the bathroom with the same man who had been eyeing her earlier. He "held anger. Anger and a sort of disillusion." When he and his family left, Varela hugged and kissed that man. When they got home and had put their daughters to bed, Vasquez asked Varela if she were having a relationship with the man. She responded in anger, "Yes, yes." She told Vasquez she had done so to make him "look like an ass."

They went to a party at the same house on January 12, 2013. The same young man was at that party and he gave Varela the same looks he had given her at the last party. In response, Vasquez announced that he and Varela had made plans to marry. The young man looked angry and Varela began to cry.

3

On February 5, Vasquez awoke to the sound of his wife as she showered in the family bathroom. He tried to get into the shower with her, but she rejected him and told him to get the girls ready for school. He went to the kitchen, "grabbed the knives," and went back to the bathroom. He testified that he "was not feeling good" and "I was out of control." He tried to hug and kiss her, but she rejected his advances. He reached for her shoulders and she shook him off. He felt that "a very uncontrollable power got into me, a feeling of a lot of hurt and pain." He testified that "it was a very out-of-control moment. I felt possessed by that power that I couldn't—I couldn't deal with that anger." A "big impulse possessed" him and he began to stab Varela.

The trial court rejected Vasquez's proposed jury instructions. They were:

"Heat of Passion: Sufficiency of Provocation

"A sudden violent quarrel, verbal taunts by an unfaithful wife, and the infidelity of a lover may be sufficient to find provocation which gives rise to the Heat of Passion. [¶] A person may be aroused to Heat of Passion by a series of events over a considerable period of time. [¶] It is not necessary that the provocation be of a kind that would cause an ordinary person of average disposition to kill. The focus rests upon whether the person of average dispositions would be induced to react from passion and not from judgment."

and

"Heat of Passion: Sufficiency of Provocation

"Provocation has been found sufficient based on . . . a sudden and violent quarrel (*People v. Elmore* (1914) 167 Cal. 205, 211); [v]erbal taunts by an unfaithful wife (*People v. Berry* (1976) 18 Cal.3d 509, 515) and the infidelity of a lover. (*People v. Borchers* (1958) 50 Cal.2d 321, 328.)"

In addition to instructing the jury as to first and second degree murder with CALCRIM No. 520 and No. 521, the judge gave CALCRIM No. 522, which provides:

"Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.

4

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The judge also instructed with CALCRIM No. 570:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

5

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Vasquez was convicted by jury of one count of first degree murder with the personal use of a knife. (Pen. Code, §§ 187, subd. (a); 12022, subd. (b)(1).)[3] The jury convicted Vasquez of one count of simple assault for the injury he inflicted on C. (§§ 240, 241.)

## DISCUSSION

Vasquez contends "the trial court's refusal to give appellant's pinpoint instructions on heat of passion and sufficiency of provocation denied appellant his constitutional right to due process and to have the jury determine every material issued presented by the evidence," and "the trial court's failure to instruct that provocation may serve to reduce a murder from first degree to second degree denied petitioner his due process right to instruction on lesser included offenses and to a jury determination of every material issue presented by the evidence."[4]

His contentions have no merit.

"'"[I]n appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case.'" (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.) However, the trial court acts within its discretion to refuse to give a pinpoint instruction if it is argumentative, merely duplicates other

_____

[3] Unless otherwise noted, further statutory references are to the Penal Code.

[4] Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Voluntary manslaughter is the unlawful killing of a human being without malice "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Generally, involuntary manslaughter is a lesser offense included within the offense of murder. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

6

instructions or is not supported by substantial evidence. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021; *People v. Moon* (2005) 37 Cal.4th 1, 30; *People v. Roldan* (2005) 35 Cal.4th 646, 715.)

All that is required is an instruction that "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 957.) The Supreme Court has characterized this definition as a "venerable understanding that has been faithfully applied by juries for decades." (*Ibid.*) The trial court instructed the jury properly by using the CALCRIM instructions.

Vasquez's citations to *People v. Berry*, *supra*, 18 Cal.3d 509, 515 (*Berry*) and *People v. Borchers*, *supra*, 50 Cal.2d 321 (*Borchers*) do not support the giving of pinpoint instructions in the case at bar. In *Berry,* the defendant and his psychiatrist testified that the defendant was provoked into killing the victim because of a sudden and uncontrollable rage so as to reduce the offense to one of voluntary manslaughter. The victim "commenced a tormenting two weeks" in which his wife alternately taunted defendant with her involvement with another man and "at the same time sexually excited defendant, indicating her desire to remain with him." (*Berry* at p. 513.) The Supreme Court held that the trial court erred in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion. (*Id.* at p. 518.) The Supreme Court did not require any specific language to be used in instructing the jury. Unlike the *Berry* jury, the jury in the case at bar was instructed as to heat of passion and voluntary manslaughter. There is nothing in *Berry* that requires the trial court to instruct, as Vasquez requested, as to "verbal taunts by an unfaithful wife." The trial court's instructions to the jury were consistent with *Berry* and proper.

In *Borchers*, the Supreme Court did not review jury instructions, but, on the People's appeal, upheld the trial court's reduction of the conviction by jury of second degree to voluntary manslaughter. The Supreme Court summarized the evidence that showed a lack of malice aforethought on the part of the defendant: "From the evidence

viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of 'passion' by a series of events over a considerable period of time: [the victim's] admitted infidelity, her statements that she wished she were dead, . . . her repeated urging that defendant shoot her, [her son], and himself on the night of the homicide, and her taunt, '[A]re you chicken[?]'" (*Borchers* at pp. 328-329.) There is nothing in *Borchers* that required the trial court to instruct as to the "infidelity of a lover" as Vasquez had requested.

The instructions given to the jury did not prevent them from considering any aspect of Vasquez's testimony. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1137.) The jury heard that Vasquez believed that Varela was romantically involved with another man. Vasquez was hurt and angered by the victim's unfaithfulness and by her rejecting his affectionate advances. They also heard that, on the morning of the murder, Varela rebuffed Vasquez's attempt to join her in the shower, and, instead, asked him to help their daughters get ready to go to school. Vasquez went to the kitchen, got two knives, and returned to the bathroom, where he stabbed the victim repeatedly. When his older daughter tried to stop him, he used sufficient force to hurt her, pushed her out of the bathroom and slammed the door behind her. He continued to stab the victim. The jury heard Vasquez testify that, at the time of the murder, he felt that "a very uncontrollable power got into me, a feeling of a lot of hurt and pain"; "it was a very out-of-control moment. I felt possessed by that power that I couldn't—I couldn't deal with that anger"; a "big impulse possessed" him.

The pinpoint instructions were duplicative of the CALCRIM instructions. To the extent that the proposed instructions were intended to focus the jury's attention on Vasquez's testimony that the victim was an unfaithful lover who had taunted him, it was redundant. The court provided the jury with comprehensive instructions as to heat of passion. We conclude that the refusal of the pinpoint instructions did not deprive Vasquez of a fair trial.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                    CHANEY, Acting P. J.


We concur:



        JOHNSON, J.



        LUI, J.

9