Filed 7/10/24  P. v. Bucaro CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082227 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2001042) |
| JUAN ALBERTO BUCARO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed.

Spolin & Dukes, Aaron Spolin, Caitlin Dukes, and Jeremy M. Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

After discovering that his wife was having an affair with her coworker, appellant Juan Alberto Bucaro drove to her workplace, waited for her lover to arrive, then shot him several times in front of multiple witnesses.  A jury convicted Bucaro of special circumstance murder, among other offenses.  On appeal, he contends the trial court made two errors in instructing the jury, wrongly refusing his pinpoint instruction relating infidelity to provocation and giving an incorrect instruction on flight (CALCRIM No. 372).  We reject both claims and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Bucaro and Victoria G. started dating shortly after they graduated from high school.  Eventually, they got married and had one child.  At the time of the shooting, in March 2020, Bucaro was not regularly employed.  Victoria supported the family by working at a wholesale bakery.

Earlier that year, their relationship had become strained.  They started arguing about a variety of issues, including finances.  Then, about a month before the shooting, Bucaro grew suspicious of Victoria.  She started spending more time with her coworkers instead of him, and she became protective of her phone.

Around 2:00 a.m. one morning in March, Bucaro took Victoria's cell phone from beneath her pillow and went through her text messages.  He discovered that Victoria was having an affair with E. Pirtle, one of her coworkers at the bakery.  The messages, dating back to December 2019, were intimate.  Bucaro read dozens of messages recounting the sexual activity between them.

Victoria woke up and tried taking her phone back.  They began arguing and struggling over the phone.  He turned away or pushed her away when

2

she went for the phone, causing her to fall down.  She sustained bruises and scrapes on her face, arms, and legs.  All the while, Bucaro continued scrolling through the messages.  At one point, he told her she would never see him or Pirtle again.  They fought on and off for about two hours, until Victoria and their child retreated to her parents' house, which was on the same property.

Bucaro was heartbroken and completely devastated.  He destroyed wedding photographs and other items in their home that belonged to Victoria.  Then, contemplating suicide, he grabbed his shotgun and six or seven shells and left in Victoria's BMW.

By this time, it was nearly 5:00 in the morning.  Bucaro drove to an ATM on the other side of town and tried to take money from Victoria's bank account, but he was thwarted by the withdrawal limit.  He drove back towards home, parked down the street from their house, and remained in the BMW while he questioned Victoria over the phone and continued reading her messages.  Although it was painful, he "couldn't stop reading them."

At the end of their call, Bucaro asked Victoria what time Pirtle was scheduled to work that day.  She claimed it was Pirtle's day off, but Bucaro nonetheless went to the bakery to confront him.  He told Victoria not to intervene, or else he would "pop" her, which she understood to mean he would shoot her.  Around 7:30 a.m., Bucaro parked down the street from the bakery and waited in the BMW, reading the rest of the messages.  He debated whether to shoot himself or Pirtle.

A coworker, Julio D., drove Pirtle to work that morning.  When they arrived shortly before their 8:00 a.m. shift, they parked in front of the bakery. They noticed Victoria's BMW was already there.  Julio and Pirtle were surprised because they did not think she was scheduled to work that day.

3

A third coworker joined Julio and Pirtle at their vehicle. They chatted briefly, then the three of them started walking into work together.

When Bucaro saw Pirtle arrive, he thought: " 'If he goes on this side, I'm going to shoot out of my vehicle. If he goes on this side, I'm going to get out of my vehicle and shoot.' " Ultimately, he drove the BMW beside the group of men, rolled down the window, and stuck his shotgun out of the window. He said nothing. Julio and the coworker ran, but Pirtle froze. At close range, Bucaro shot Pirtle once, fixed a jam in the shotgun, then shot three more times as he lay on the ground.

Julio called 911 and tried to help Pirtle, but it was too late. Pirtle died at the scene of multiple shotgun wounds to the front and back of his torso. The shooting was captured on a nearby surveillance camera and witnessed by several bakery employees.

After leaving the bakery, Bucaro drove to his mother's house, where his aunt had spent the night. He told his aunt that he was going to move her car, then took off in it, leaving the BMW, Victoria's phone, and the shotgun behind. Bucaro was scared and wanted to flee. He headed towards Mexico, but stopped in the desert to think. He decided to turn himself in. He returned home to see his child one last time. When he arrived, the police were already there. He exited his aunt's car with his hands up.

The next morning, Bucaro called his mother from jail. He expressed how he felt betrayed and heartbroken by the affair. He had been feeling so jealous and depressed and could not figure out why, until now. When his mother said he should have called her so she could talk him out of it, he disagreed. "If I wouldn't have shot him right there in front of everybody, I would have shot him where nobody could see." He realized he would be imprisoned "for years" because of his actions, but " '[a]t least that

4

motherfucker's dead,' " he said. When his mother admonished him that no one deserves to be killed, he suggested it was "not fair" that Pirtle had relations with his wife, so now he "doesn't have nothing no more." At trial, however, Bucaro testified that he felt remorse and shame over what he had done.

The prosecution charged Bucaro with murdering Pirtle (Pen. Code,[1] § 187, subd. (a); count 1); discharging a firearm from a motor vehicle (§ 26100, subd. (c); count 2); inflicting corporal injury upon Victoria resulting in a traumatic condition (§ 273.5, subd. (a); count 3); and making a criminal threat (§ 422; count 4). As to count 1, the prosecution alleged two special circumstances: Bucaro intentionally killed Pirtle by lying in wait and by shooting from a motor vehicle (§ 190.2, subd. (a)(15) & (a)(21)). Regarding counts 1 and 2, the prosecution further asserted that he personally and intentionally discharged a firearm causing great bodily injury and death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)).

A jury convicted Bucaro of first degree murder, discharging a firearm from a motor vehicle, and making a criminal threat (counts 1, 2, and 4). The jury found both special circumstances and the firearm allegations true. It could not reach a verdict on whether he inflicted corporal injury (count 3), so the court declared a mistrial on that count.

Bucaro was sentenced to life in prison without the possibility of parole for the special circumstance murder (count 1), plus a concurrent term of two years for making a criminal threat (count 4). The court imposed but stayed (pursuant to section 654) a five-year term for shooting from a motor vehicle (count 2), as well as two terms of 25 years to life for the firearm

---

1    Further undesignated statutory references are to the Penal Code.

enhancements. It dismissed the charge of inflicting corporal injury (count 3) on the prosecution's motion.

## DISCUSSION

### A. *The trial court properly refused to give the proposed pinpoint instruction.*

Bucaro contends the trial court erred by declining to give a requested pinpoint instruction relating infidelity to provocation and heat of passion. We see no such error, as the proposed language was legally incorrect, confusing, and argumentative. Moreover, any assumed error was undoubtedly harmless.

Murder is an unlawful killing with malice. (§ 187, subd. (a).) Murder that is perpetrated by lying in wait, by shooting from a motor vehicle, or with premeditation and deliberation, is murder in the first degree. (§ 189, subd. (a).) "All other kinds of murders are of the second degree." (*Id*., subd. (b).)

When a killing that would otherwise be considered murder occurs "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)), the malice required for murder is negated or disregarded and the offense is reduced or mitigated to voluntary manslaughter. (*People v. Bryant* (2013) 56 Cal.4th 959, 968, 970; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 (*Carasi*).)

Heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) No specific type of provocation is required. (*People v. Berry* (1976) 18 Cal.3d 509, 515.) " 'The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time.' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481 (*Jennell Wright*).) "The passion aroused can be anger, rage, or

6

any violent, intense, highly wrought or enthusiastic emotion, except revenge." (*Ibid.*) "[W]hether adequate provocation and heat of passion have been shown are fundamentally jury questions . . . ." (*Id*. at p. 1482.)

Heat of passion can reduce murder to voluntary manslaughter when, "at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*Jennell Wright*, *supra*, 242 Cal.App.4th at p. 1481; accord, *Carasi*, *supra*, 44 Cal.4th at p. 1306.) Accordingly, "both subjectively felt heat of passion and objectively reasonable provocation are needed to negate malice and reduce a murder to" voluntary manslaughter. (*Jennell Wright*, at p. 1481.)

Provocation that is insufficient to reduce murder to manslaughter may nevertheless reduce first degree murder to second degree by negating premeditation and deliberation. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*Ibid*.) First degree premeditated murder "involves a cold, calculated judgment, including one arrived at quickly [ ], and is evidenced by planning activity, a motive to kill, or an exacting manner of death. [ ] Such state of mind 'is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct.' " (*Carasi*, *supra*, 44 Cal.4th at p. 1306, citations omitted.)

"Pinpoint instructions relate particular facts to a legal issue or pinpoint the crux of a defendant's case. [ ] 'Parties are entitled to legally correct and

7

factually warranted pinpoint instructions, should they request such additional instruction.' [ ] But a trial court may 'refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [ ], or if it is not supported by substantial evidence.' [ ] We review claims of instructional error de novo." (*People v. Zemek* (2023) 93 Cal.App.5th 313, 346 (*Zemek*), citations omitted.)

At the jury instruction conference, citing *People v. Borchers* (1958) 50 Cal.2d 321 (*Borchers*) defense counsel requested the following pinpoint instruction:

> "As a matter of law, infidelity by a spouse, partner, or lover is sufficient evidence of provocation. Whether infidelity in this case was sufficient provocation is a determination you must make under the totality of the circumstances."

Defense counsel represented that *Borchers* stood for "the legal principle that infidelity can be – is something that's recognized as provocation." Counsel wanted the jury to understand "that the defense's argument that infidelity is sufficient for provocation is not something that . . . defense lawyers come up with." Rather, "it is recognized by the courts and by the CALCRIMs as a form of provocation." The prosecutor countered that the instruction was "wholly inappropriate" because whether infidelity constitutes provocation is a question of fact for the jury.

The trial court declined to give the requested pinpoint instruction, agreeing with the prosecutor that it is up to the jury to decide whether there is sufficient provocation. The court also found *Borchers* to be factually and procedurally distinguishable from this case.

We agree with the trial court's reasoning. To the extent the proposed instruction stated that infidelity is always sufficient evidence of provocation as a matter of law, it was incorrect and argumentative. While infidelity *may*

8

give rise to heat of passion, it does not do so in every case. Whether adequate provocation and heat of passion have been shown are fundamentally questions of fact for the jury. (*Jennell Wright*, *supra*, 242 Cal.App.4th at p. 1482.) Instructing the jury as Bucaro suggested would effectively create a presumption that infidelity is objectively reasonable provocation under any circumstance, which would improperly remove that element from the jury's consideration. (See *People v. Hines* (1997) 15 Cal.4th 997, 1067–1068 [an argumentative instruction " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence' "].) To be sure, the second sentence of the proposed instruction correctly states that "[w]hether infidelity in this case was sufficient provocation is a determination you must make under the totality of the circumstances." However, paired with the first sentence, this only rendered the instruction as a whole confusing as to how the jury could consider the evidence of infidelity and the issue of provocation.

*Borchers*, *supra*, 50 Cal.2d 321—which Bucaro continues to rely on— does not say otherwise. In *Borchers*, the trial court reduced a conviction from second degree murder to voluntary manslaughter under section 1181, subdivision (6),[2] and the People appealed. (*Borchers*, at p. 323.) The Supreme Court affirmed, opining that "the trial judge could well have concluded that defendant was roused to a heat of 'passion' by a series of events over a considerable period of time: [his fiancée's] admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, [her son], and himself on the night of the homicide, and her taunt, 'are you

_____

[2]     Under this provision, "[I]f the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict" accordingly. (§ 1181, subd. (6).)

9

chicken.' " (*Id.* at pp. 328–329.) *Borchers* held that the evidence presented in that case, which included infidelity among other conduct, was sufficient to support the trial court's finding that the defendant committed voluntary manslaughter, not murder. (*Id.* at pp. 329–330.) Under a fair reading of *Borchers*, a factfinder may consider infidelity as evidence of provocation in deciding *whether* a defendant killed in the heat of passion. *Borchers* does not stand for the proposition that infidelity always constitutes sufficient provocation.

Even assuming the trial court erred in refusing to give the pinpoint instruction, we would deem the error harmless. The failure to instruct the jury on an appropriate pinpoint instruction is reviewed for harmless error pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Zemek, supra*, 93 Cal.App.5th at p. 347.) "The denial of a pinpoint instruction is harmless under *Watson* where the instructions that were given do not preclude findings consistent with the proposed pinpoint instruction's theory and where the defense counsel fully argued the point to the jury." (*Zemek*, at p. 347.)

Here, the trial court gave the standard instructions on provocation and heat of passion. In relevant part, CALCRIM No. 522 told the jury that "[t]he weight and significance of the provocation, if any, are for you to decide." And CALCRIM No. 570 elaborated:

> "While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

10

These instructions provided the jury with the legal principles necessary to decide the factual issue of whether the affair between Victoria and Pirtle was sufficiently provocative. They did not preclude the jury from making that finding, nor did they undermine defense counsel's closing argument.

Indeed, defense counsel immediately focused the jury on the heat-of-passion issue. Counsel advised the jury that "one of our oldest legal principles" is that infidelity is a provocative act that can create heat of passion. He asserted that the infidelity and "vulgar" text messages between Victoria and Pirtle were the "catalyst" in this case, and the provocation lasted as long as Bucaro read the messages, which was continuously throughout the morning until moments before the shooting. As Bucaro testified, he could not stop reading them. Counsel argued that the cooling-off period did not begin until Bucaro left Victoria's phone in the BMW and drove into the desert. (See *People v. Moye* (2009) 47 Cal.4th 537, 550 [" ' "if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter" ' "].) Without the text messages, he regained reason and decided to surrender.

For his part, the prosecutor did not tell the jury that infidelity could never constitute provocation as a matter of law. He acknowledged that the text messages were heartbreaking and devastating for Bucaro. Nevertheless, the prosecutor suggested that Pirtle was not the source of the provocation. Rather, Bucaro provoked himself by choosing to read the messages. (See *People v. Lee* (1999) 20 Cal.4th 47, 59 [the provocation inciting the heat of passion "must be caused by the victim [ ], or be conduct reasonably believed by the defendant to have been engaged in by the victim" (citation omitted)].)

11

The thrust of the prosecutor's argument was that, even assuming that discovering the affair constituted provocation, the murder was "at least five hours later, with multiple steps and plans in between." In other words, Bucaro acted thoughtfully and deliberately in the hours following his discovery; he did not shoot Pirtle under the influence of intense emotion. To that point, the prosecutor highlighted that Bucaro's initial reaction was not violence; it was to spend hours digging deeper into the text messages. He went on to destroy Victoria's property in the home, while avoiding his own. Then, he carefully got dressed, grabbed her debit card, drove to the bank, entered her code, and tried three times to withdraw cash. When this failed, he returned home and "refin[ed] his plan" to kill Pirtle, inquiring what time Pirtle started work. He then drove to the bakery and waited for at least 25 minutes. When Pirtle arrived, Bucaro exercised "clear judgment" and "executive function[ ]" to create a plan: if Pirtle passed by one side of the car, Bucaro would shoot from the car, but if he passed on the other side, he would get out of the car and shoot. The shooting itself also demonstrated "executive functioning," as Bucaro loaded the shotgun, fired once, fixed a jam, then continued firing until Pirtle was surely dead. Finally, the prosecutor pointed out that his behavior after the shooting—fleeing, changing cars, driving toward Mexico, and the callous jail call with his mother—was also inconsistent with someone who simply snapped and was shocked at what they had done.

In sum, we conclude the trial court appropriately rejected the pinpoint instruction requested by the defense. And, even assuming error, it was certainly harmless because the standard instructions and closing arguments of counsel fairly placed the relevant factual question before the jury.

**B.** *There is no error in the flight instruction (CALCRIM No. 372).*

Bucaro also contends the trial court erred and violated his rights to due process and a fair trial when it gave the jury the standard instruction on flight (CALCRIM No. 372). That instruction provided as follows:[3]

> "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Bucaro specifically claims that this language conflicted with section 1127c and was impermissibly argumentative. He suggests the instruction improperly allowed the jury to find guilt based on flight alone. These arguments, and others like them, have been repeatedly rejected by the courts. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 500–502; *People v. Price* (2017) 8 Cal.App.5th 409, 454–458 (*Price*); *People v. Paysinger* (2009) 174 Cal.App.4th 26, 29–32 (*Paysinger*); *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1157–1159.) Most relevant here are *Paysinger* and *Price*.

The court in *Paysinger* rejected the argument that Bucaro makes regarding section 1127c. That statute dictates that, in any criminal trial "where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

_____

[3] The Attorney General accurately points out that Bucaro did not object to this instruction in the trial court. However, since Bucaro's contention, if true, would affect his substantial rights, we decide this issue on the merits. (See § 1259; *People v. Mitchell* (2019) 7 Cal.5th 561, 579–580.)

13

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (*Paysinger, supra,* 174 Cal.App.4th at p. 31.)

Like Bucaro, the defendant in *Paysinger* argued that CALCRIM No. 372 was inconsistent with section 1127c because the instruction "tells the jury that flight may show awareness of guilt before telling the jury that flight alone is not sufficient to prove guilt, while . . . section 1127c communicates those ideas in the opposite order." (*Paysinger, supra*, 174 Cal.App.4th at p. 31.) Insofar as the defendant asserted this difference made the flight instruction "constitutionally deficient because the first sentence of the instruction 'strongly suggests . . . that evidence of flight is in fact sufficient to show guilt,'" the *Paysinger* court was not persuaded. (*Ibid*.) As the court reasoned, the first sentence of CALCRIM No. 372—"[i]f the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt"—suggests no such thing, and in any event the final sentence of the instruction—"[e]vidence that the defendant fled cannot prove guilt by itself"—positively refutes any such suggestion. (*Paysinger*, at p. 29.)

To the extent Bucaro claims the flight instruction was argumentative, *Price* is instructive. Both the defendants in *Price* and Bucaro relied on *People v. Wright* (1988) 45 Cal.3d 1126 (*Carl Wright*). (*Price, supra*, 8 Cal.App.5th at p. 458.) In *Carl Wright*, the defense requested a special instruction that listed five pieces of evidence and told "the jury that it may 'consider' such evidence in determining whether defendant is guilty beyond a reasonable doubt.'" (*Carl Wright*, at p. 1135 & fn. 5.) The Supreme Court held the trial court correctly "refused to give this instruction because it is argumentative,

14

i.e., it would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact, and therefore properly belongs not in instructions, but in the arguments of counsel to the jury." (*Id*. at p. 1135.) Discussing a previous opinion, the Supreme Court reiterated that it is improper to select certain facts and endeavor " 'to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions' . . . ." (*Ibid*.) " 'An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*Ibid*.)

The *Price* court deftly distinguished *Carl Wright*: "[U]nlike the instruction the defendant requested in [*Carl*] *Wright*, which sought to focus the jury's attention on a list of items of evidence that favored the defendant, the instruction here focuses solely on one factor, evidence of flight, and not on a laundry list of evidence favoring the prosecution, and there is a statute—section 1127c—that requires an instruction on flight if there is evidence of flight. (§ 1127c.)" (*Price, supra*, 8 Cal.App.5th at p. 458.) More broadly, *Price* concluded that CALCRIM No. 372 was not argumentative since it "does not focus on certain evidence and direct the jury how to consider the evidence." (*Price*, at p. 458.) Rather, while informing the jury that it can but need not infer guilt from flight, the instruction leaves it up to the jury to decide the meaning and importance of that conduct. (*Ibid*.) The instruction further limits the use of flight evidence by providing that it is not alone sufficient to prove guilt. (*Ibid*.)

Finally, upon considering the instructions as a whole, both *Paysinger* and *Price* discerned no reasonable likelihood that a jury would understand the flight instruction as vitiating the presumption of innocence, as the juries

in those cases were give many instructions regarding their factfinding duties, the presumption of innocence, and the prosecution's burden to prove guilt beyond a reasonable doubt. (*Paysinger*, *supra*, 174 Cal.App.4th at p. 30; *Price*, *supra*, 8 Cal.App.5th at p. 456.) The jury in this case was given the same essential instructions (see, e.g., CALCRIM Nos. 200 & 220), and we likewise we see no reasonable possibility that it would have interpreted and applied the flight instruction in the way Bucaro suggests on appeal.

We find these cases persuasive, and adopt their reasoning here. Thus, we conclude the flight instruction was legally and constitutionally sound.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

RUBIN, J.

16